Paul E. Watson, et al. [1] v. Commissioner. Watson v. Commissioner
Docket Nos. 55521, 56225, 56237, 56255, 56260, 56268, 56269, 56271, 56276, 56329, 57397.
United States Tax Court
T.C. Memo 1960-255; 1960 Tax Ct. Memo LEXIS 31; 19 T.C.M. (CCH) 1409; T.C.M. (RIA) 60255; November 30, 1960
*31 The petitioners are executive-employees of R & R corporation. Early in 1943, the stock of R & R corporation consisted of 15,000 shares of common stock, all of which was held by members of 2 families and an estate. In 1943, the corporation issued 15,000 shares of preferred stock as a stock dividend on the common stock. Thereafter, new common stock was issued. The members of the families and the estate, in 1943, sold 9,400 shares of new common stock to executive employees, including petitioners, and 2,400 shares to the R & R corporation to be held in its treasury. In subsequent years, some of the petitioners purchased common stock from the corporation. All of the new common stock was deposited in a voting trust. The new common stock was subject to repurchase by the corporation when employment of the employee to whom stock was originally issued ended because of death or other causes. The voting trust was terminated in 1949. The petitioners sold to members of their immediate families, or made gifts to them or to trusts, all or most of the common stock involved. R & R corporation paid dividends on the stock during the taxable years. Petitioners reported in their income tax returns the *32 dividends on the shares of stock which they retained, if any. Otherwise, the transferees of the stock reported the dividends. Upon the facts, held: (1) The dividends in dispute did not constitute additional compensation to any of the petitioners for services to the corporation. (2) Valid gifts and sales of shares of stock were made by the petitioners Watson, Littell, and Emery; they did not retain dominion and control over the stock or the dividends; the dividends are not taxable to any of them. (3) For failure of proof, all of the dividends in question are taxable to each of the other petitioners. Keith I. Parsons, Esq., 231 S. LaSalle St., Chicago, Ill., C. Ives Waldo, Jr., Esq., William Cyril Burns, Esq., Harold L. Feigenholtz, Esq., 139 N. Clark St., Chicago, Ill., and Theodore C. Weinberg, Esq., for the petitioners. [2] *33 Andrew Kopperud, Jr., Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined income tax deficiencies for the years 1944-1947, inclusive as follows: Dkt. No.
Petitioner
Years
Deficiency
55521
P. E. Watson
1944
$ 9,990.75
1945
10,815.52
1946
9,922.37
1947
10,082.83
56225
W. P. Littell
1944
2,974.94
1945
3,159.01
1946
3,238.98
1947
6,853.93
56237
C. Emery
1944
140.00
1945
321.25
1946
954.01
1947
1,905.70
56255
H. B. Ketting
1947
2,711.93
56260
K. D. Stewart
1944
1,093.00
1945
1,105.35
1946
1,061.40
1947
4,156.52
56268
D. R. Willis
1944
245.00
1945
140.00
1946
499.49
1947
787.29
56269
R. V. Rice
1944
220.00
1945
418.41
1946
408.50
1947
180.50
56271
R. W. Metzger
1944
770.18
1945
915.59
1946
1,067.89
1947
1,908.93
56276
H. S. Vanderbie
1947
390.34
56329
H. B. Groseth
1947
396.99
57397
O. Zahner
1944
684.29
1945
790.77
1946
672.95
1947
873.96
All of the petitioners are employees of the same corporation. Common stock of the corporation was sold to each petitioner who transferred all, or most, of such stock to a member of his family. All of the common stock involved was eventually transferred to the trustees of a voting trust in exchange for voting trust certificates. The issue is *34 whether the dividends are taxable to the petitioners. If not, whether they were compensation for petitioners' services in the guise of dividends and therefore taxable to petitioners. Findings of Fact All of the petitioners, except Oscar A. Zahner, resided in Illinois, in Chicago or its vicinity, during the taxable years, and they filed their respective income tax returns with the collector of internal revenue for the first district of Illinois. Oscar A. Zahner was a resident of St. Louis, Missouri, and he filed his returns with the collector of internal revenue for the first district of Missouri. In 1943 and for several prior years, each petitioner was an employee of Ruthrauff & Ryan, Inc., which is referred to hereinafter as R & R. All of the petitioners were employed in the Chicago office of R & R except Oscar Zahner who was employed in the corporation's office in St. Louis, Missouri. In 1943, Paul E. Watson was an executive vice-president of R & R, the manager of its western division, and a director. Littell, Emery, Stewart, Willis, Rice, Metzger, and Zahner were vice-presidents in 1943; Ketting and Groseth became vice-presidents in 1944; and Vanderbie became vice-president in *35 1946. All of petitioners were among the top personnel. In 1946, Stewart became a director. In 1943, there were issued and outstanding 15,000 shares of no par value common stock of R & R. On November 22, 1943, a voting trust agreement between R & R, Raymond F. Sullivan, a holder of common stock, and three individuals, as voting trustees, was executed. During 1944 and thereafter, all of the common stock was assigned and transferred to the voting trustees who issued common stock voting trust certificates for the common stock. During the years 1943, 1945, 1946, and 1947 certificates representing shares of common stock in various amounts were issued to the respective petitioners, or voting trust certificates. The total amount of common stock involved is 3,250 shares. Dividends were declared on this common stock in each of the taxable years here involved, 1944-1947, inclusive, which were received by the holders of the voting trust certificates which were issued for the common stock. The respondent has determined that the amounts distributed as common stock dividends in the years involved are taxable to each of the petitioners, respectively. Originally, the number of shares of the common *36 stock, or of common stock voting trust certificates, which were acquired by each of the petitioners was as follows: No. of Shares of
Name of Taxpayer
Common Stock
Watson
1,600
Littell
1,050
Emery
300
Ketting
400
Stewart
750
Willis
200
Rice
100
Metzger
400
Vanderbie
150
Groseth
100
Zahner
200
3,250
The facts relating to the organization and operations of R & R, the creation of the voting trust, the salaries paid to the petitioners and other employees of R & R, the acquisition by the petitioners of common stock certificates or common stock voting trust certificates, the transfers thereof to the respective wives and members of the families of the petitioners, or to trusts, the distributions of dividends declared on the common stock involved, and the use of such distributions are as follows: Ruthrauff & Ryan, Inc. Wilbur B. Ruthrauff and Frederick B. Ryan organized a partnership in 1912. In 1917, the business was incorporated under the laws of New York as Ruthrauff & Ryan, Inc.The corporation has at all times conducted a national advertising agency business having its main office and headquarters in New York City and branch offices in 13 other cities throughout the United States, from coast to coast. Included *37 in all of the branch offices are offices in Chicago, Illinois, Detroit, Michigan, St. Louis, Missouri, and Hollywood, California. The Chicago office is the headquarters for the so-called western division of the business. R & R had approximately 650 employees in all of its offices and organization during the taxable years. R & R was, in 1943 and before, a closely held family corporation, all of its stock being owned by the members of the respective families of Wilbur B. Ruthrauff and Frederick B. Ryan. Wilbur B. Ruthrauff died on March 13, 1941. In 1941 the authorized capital of R & R was $100,000, and the authorized capital stock was 15,000 shares of common stock without par value, all of which was issued and outstanding and was held in equal amounts by the members of the two families, as follows: Ruthrauff Family
No. of Shares
Estate of W. B. Ruthrauff
3,198
Abbie H. B. Ruthrauff
2,952
F. Bourne Ruthrauff
675
Florence Ruthrauff
675
7,500
Ryan Family
No. of Shares
Frederick B. Ryan
3,198
Elizabeth C. Ryan
2,952
Frederick B. Ryan, Jr.
450
Quincy G. Ryan
450
Bruce E. Ryan
450
7,506 There were no changes in the holdings of stock of R & R until 1943. The common stock which was issued and outstanding, above *38 referred to, was not subject to any repurchase agreement with R & R. The balance sheet of R & R as of December 31, 1942, showed that its assets, liability, surplus, and capital stock were as follows: Assets
Cash
$ 473,199.65
Accounts receivable
1,428,985.00
Notes receivable
88,220.00
Work in process
35,028.65
Investments
1,771.00
Office equip. less deprec.
64,099.45
Deferred items
5,092.01
$2,096,395.76
Liabilities and Capital
Accounts payable
$1,108,198.31
Accrued payroll and com-
pensation
162,247.51
Reserve for taxes payable
162,907.43
Reserve for bond purchases
14,788.21
Reserve for commissions
28,077.12
Deferred credit, group ins.
1,032.44
Reserve for contingencies
138,007.49
Surplus
381,137.25
Capital stock
100,000.00
$2,096,395.76
The earnings of R & R after Federal income tax and dividends paid for each of the years 1939-1942, inclusive, were as follows: Earnings
Year
After Taxes
Dividends Paid
1939
$152,795.18
$130,000.00
1940
231,442.08
250,000.00
1941
240,450.35
250,000.00
1942
199,043.46
150,000.00
In October of 1943, the directors of R & R voted to declare and pay a stock dividend of new, preferred stock on the basis of one share of preferred stock for each share of common stock and pursuant to such action the stock of R *39 & R was increased under section 36 of the stock corporation law of New York. In October 1943, the directors adopted a resolution that the corporation should adopt a profit-sharing plan for the benefit of all persons employed by it for a period of at least 5 years, and such profit-sharing plan was duly adopted. In 1943, a committee of executives of R & R was created to recommend which employees should be allowed to purchase common stock of R & R and the numbers of shares such employees could purchase. The committee made recommendations and at the end of 1943 common stock was made available to certain top personnel. On November 22, 1943, R & R entered into a repurchase agreement with a holder of common stock which provided that other common stockholders could become parties to the repurchase agreement. In due course, all of the common stockholders became parties to the repurchase agreement. New certificates of common stock were issued by R & R which bore the following on the face thereof: The sale, transfer or other disposition of the shares of stock represented by this certificate are subject to the terms of a repurchase agreement with Ruthrauff & Ryan, Inc., and are limited and restricted *40 as therein provided. In December 1943, some of the petitioners acquired common stock represented by the new certificates. On November 22, 1943, R & R, a common stockholder, and certain individuals described as voting trustees entered into a voting trust agreement which provided for the transfer of certificates for common stock to the voting trustees, and for the issuance by the voting trustees of common stock voting trust certificates. The agreement provided that all common stockholders could become a party to the voting trust agreement at any time, and eventually all such stockholders became parties to the agreement. The facts pertaining to each of the above-described matters are as follows: Stock Dividend A special meeting of the directors of R & R was held on October 25, 1943, in New York City, which was attended by the directors, Frederick B. Ryan, president of R & R, C. J. McCarthy, Sr., Frederick C. Bruns, Everett J. Grady, Ralph Van Buren, and Raymond F. Sullivan. At this meeting two resolutions were adopted. One resolution represented a declaration of a stock dividend of one share of no par value preferred stock for every share of common stock outstanding on October 25, 1943, *41 and authorized the transfer of $15,000 from the corporation's surplus account to its capital account. The other resolution approved the adoption of a profit-sharing plan, which is described hereinafter. Pursuant to the declaration of the stock dividend, the stock of R & R was increased to 30,000 shares, and a certificate of increase of the number of shares of stock and reclassification of previously authorized stock executed by the president and secretary of R & R on October 29, 1943, was filed in the Department of State of New York on November 5, 1943. The directors' declaration of a stock dividend was ratified by the required number of stockholders on October 25, 1943. The designations, preferences, privileges, and voting powers of the preferred and common stock, respectively, after the preferred stock was created, were as follows: The election of directors of the corporation is vested in the holders of the common stock for as long as there is no default in the payment of the dividend of $7 per annum on all of the preferred stock, and the holders of the preferred stock shall have no right to vote in the election of directors as long as preferred stock dividends are paid, but if such *42 dividends are not paid on any semiannual dividend date the preferred stockholders shall have the sole and exclusive voting power of the corporation (and other designated powers) until all accumulated and unpaid dividends on the preferred stock are paid in full, after which the common stock as a class shall resume possession of the sole right to elect directors (and other powers). The new preferred stock is cumulative preferred stock; the holders thereof are entitled to receive dividends at the rate of $7 per share per annum, and no more, payable in semiannual installments out of surplus or net profits before any dividend can be declared, provided for, or paid on the common shares. If any preferred stock dividends are not paid as required, such unpaid dividends shall accumulate, without interest, and the accumulated dividends shall be fully paid before any dividends on common shares can be paid. The common stock is entitled to such dividends as may be lawfully declared by the directors, provided there are no unpaid accumulations of preferred stock dividends. The preferred stock is redeemable at $100 per share plus all accumulated and unpaid dividends thereon up to the redemption date. *43 At the option of the corporation, and upon written notice, the preferred shares may be redeemed as a whole, or in part by lot, on any dividend payment date, such dates being the first of January and July of each year. Upon the liquidation of the corporation and the distribution of its assets the preferred stock shall be entitled to receive an amount equal to $100 per share together with all accumulated and unpaid dividends, and the common stock shall be entitled to receive all of the corporation's property remaining after payment of $100 and accumulated dividends on each share of preferred stock. Employees' Profit-Sharing Plan The employees' profit-sharing plan which was adopted pursuant to the directors' vote and stockholders' ratification on October 25, 1943, included officers who were employees and all other regular employees who had been continuously employed by R & R for at least 5 years prior to December 31, 1943, and such employees were participants under the plan. A trust fund was established under the plan, pursuant to a trust agreement dated as of November 26, 1943, between R & R and Central Hanover Bank and Trust Company of New York City, Trustee. Contributions are to *44 be made to the trust fund by R & R from its profits in those years in which the earnings of the corporation in the opinion of the directors justify making such contributions, and in such amounts as the directors determine. The corporation's contributions to the fund are to be allocated and apportioned among all of the employees entitled to participate in the plan, and each employee acquires a proportionate interest in the trust fund and the right to designate a beneficiary to receive his interest upon his death. The chief benefit to each participant in the plan is payment to him or her of a lump sum amount or annual payments upon retirement or becoming totally incapacitated, or payments to beneficiaries upon death. The plan was intended to conform to applicable provision of the Internal Revenue Code relating to employees' trusts, namely, section 165 of the Internal Revenue Code of 1939. The corporation's contributions to the profit-sharing plan during the years 1943-1947 were as follows: 1943
$179,680.77
1944
122,834.52
1945
185,134.80
1946
76.48
1947
153,674.47
$641,401.04
Common Stock Repurchase Agreement On or about November 22, 1943, a policy was adopted by R & R and its stockholders which *45 purportedly would permit selected employees to acquire common stock of R & R. A committee had been formed to make recommendations as to which employees should be allowed to acquire common stock and the number of shares which each one of such selected employees could acquire. The members of the committee were Frederick B. Ryan (president, a director, and a stockholder), Frederick B. Ryan, Jr. (a stockholder), F. Bourne Ruthrauff (a stockholder), two nonstockholder employees in the New York office, C. J. McCarthy and Everett J. Grady, and two nonstockholder employees in the Chicago office, Paul E. Watson and Kenneth D. Stewart. Prior to the issuance of common stock to any of the selected, key employees it was decided that "the sale, transfer, and other distribution of such stock to [the] Company's active and productive employees" should be restricted by providing for the Company's repurchase of stock issued to an employee upon the death or retirement of the employee, or upon the termination of his employment by the company for any reason whatsoever. On or about November 22, 1943, another policy had been adopted by R & R to the effect that it would be to the best interests of the corporation *46 and the common stockholders to act together concerning the management of the company and to unite the voting power held by the common stockholders in the hands of voting trustees. Pursuant to both policies, a common stock repurchase agreement dated November 22, 1943, was executed on November 22, 1943, by Frederick B. Ryan for R & R and Ralph Van Buren, as a holder of R & R common stock, who was an employee. It was provided in the agreement that any other common stockholder could become a party to the agreement. During the period from the time of the execution of the repurchase agreement through the years 1944-1947, there was only one modification of the agreement which was made by an agreement dated March 6, 1944, between R & R and Ralph Van Buren. The repurchase agreement applied to any and all shares of common stock or voting trust certificates issued therefor. All of the repurchase agreement of November 22, 1943, and all of the supplemental agreement of March 6, 1944, are incorporated herein by this reference. The provisions of the supplemental agreement of March 6, 1944, constituted clarifications of a few of the provisions of the original agreement, and they are not relevant. *47 The material and relevant provisions of the agreement of November 22, 1943, are as follows: * * *
WITNESSETH: WHEREAS, the common stock of Company has been, or is about to be, acquired by various of its employees; and WHEREAS, Company's employees agree that their joint and several interests would best be served by restricting the sale, transfer and other distribution of such stock to Company's active and productive employees, and by providing for Company's purchase of each employee's stock interest upon death, retirement or termination of employment by Company for any reason whatsoever; NOW, THEREFORE, in consideration of the premises herein and other good and valuable consideration exchanged between the parties, the receipt of which is hereby acknowledged, it is mutually agreed as follows: FIRST: That any and all shares of Company's common stock, or voting trust certificates therefor, now owned, or hereafter acquired by Stockholder, or by him sold, transferred or assigned to any person, firm, or corporation, shall be subject to purchase by Company upon the death, retirement or termination of Stockholder's employment by Company for any reason whatsoever, upon the following terms and *48 conditions: a. The purchase price to be paid by Company shall be $5.00 for each share of stock or for each share of stock represented by voting trust certificate therefor. b. At any time subsequent to Stockholder's retirement or termination of employment, either party may advise the other party hereto, its or his representatives or assigns as the case may be, by registered mail, of the date, not more than ten days thereafter, when such shares of stock or voting trust certificates shall be delivered to Company at its principal office in the city of New York, properly endorsed for sale and transfer, in exchange for payment of the total price thereof. * * *
SECOND: That any shares of stock or voting trust certificates acquired by Stockholder which are sold, assigned or transferred by such employee, shall, in all respects, be subject to the provisions of this agreement and to purchase upon Stockholder's death, retirement or termination of employment in the same manner and upon the same terms as are herein provided with respect to shares of stock or voting trust certificates registered in Stockholder's name. Company and the voting trustees of Company's common stock, if any, may require such *49 transferee to execute an instrument in writing specificially subjecting to the terms and provisions of this agreement such shares of stock or voting trust certificates so sold, assigned or transferred, prior to the delivery of certificates reflecting such change in ownership. THIRD: That this contract shall be binding upon the heirs, executors, administrators, representatives, successors and assigns of the respective parties hereto. * * *
In case of the death or resignation of Frederick B. Ryan or F. Bourne Ruthrauff, as trustee, the surviving trustees are agreed to vote for the election of Frederick B. Ryan, Jr. , Quincy G. Ryan, and Bruce E. Ryan as successor trustee, in that order. At some time after 1947, there were additional modifications of the common stock repurchase agreement. [3] One of them modified subparagraph "First" by deleting the provision that the repurchase price to be paid by the corporation for each share of common stock would be $5 per share, and substituting a provision that such repurchase price would be the book value per share or $5, whichever was higher. All of the individuals holding shares of common stock agreed to this modification of the repurchase agreement, *50 the corporation has repurchased common stock for from $50 to $60 per share. Voting Trust Agreement A voting trust agreement was executed on November 22, 1943, by R. F. Sullivan, as an owner of common stock, and 3 voting trustees, Frederick B. Ryan, Everett J. Grady, and F. Bourne Ruthrauff. All were employees of R & R in its New York office. All of the voting trustees were directors of R & R during the years 1942 through 1947; in 1943, Ryan was president; Grady was the executive vice-president; and Ruthrauff was a vice-president. The voting trust agreement, the voting trust certificate, and the form of the assignment of the voting trust certificate are included herein by this reference. The parties to the agreement were the corporation, owners of common stock who might enter into the agreement, and the voting trustees. The original *51 term of the voting trust was 10 years, to November 22, 1953. However, it was terminated on March 30, 1949, at which time the voting trust certificates were cancelled and certificates of common stock were given in exchange therefor, so that the shares of common stock were returned to all who had deposited them in the voting trust. The agreement provided in part that the stockholders of the company deemed it advisable in their own and the company's best interests to act together concerning the management of the company and to unite the voting power held by them as stockholders in the hands of the voting trustees; that a stockholder and any other owner of fully paid common stock of the company could at any time become a party to the agreement; that the trustees would pay all cash dividends to the owners of the voting trust certificates issued upon the deposit of common stock in the voting trust; that voting trust certificates were transferable; that such transfers would be recorded on the books of the trustees; and that during the term of the voting trust additional shares of stock could be deposited in the trust in exchange for voting trust certificates. The voting trust certificates *52 stated that the individual named in the certificate or his assignee would be entitled to the return of common stock certificates in the number of shares deposited in the voting trust, plus any accrued and unpaid dividends, upon the termination of the voting trust on November 22, 1953, or such date before then as the trust should end. Acquisition of Common Stock by Employees in December 1943 After the execution of the repurchase and voting trust agreements on November 22, 1943, the then holders of 15,000 shares of common stock of R & R, who have been listed above, namely, the Ruthrauff estate and members of the Ruthrauff and Ryan families, transferred 9,400 shares of common stock to the selected employees, and 2,400 shares to the R & R corporation. After such transfers certain individuals retained a total of 3,200 shares of the common stock, as follows: No. of Shares
Common Stockholder
Retained
F. Bourne Ruthrauff
400
Elizabeth C. Ryan
1,700
Frederick B. Ryan, Jr.
400
Quincy G. Ryan
400
Bruce E. Ryan
300
3,200
The R & R corporation and each of the employees involved in the transfers of the common stock paid the then holders of shares of common stock, the transferors, $5 per share. The Ruthrauff *53 estate and the individual members of the Ruthrauff and Ryan families transferred a total number of shares and retained shares as follows: No. of
No. of
Shares
Shares
Ruthrauff Family
Transferred
Retained
Estate of W. B. Ruthrauff
3,198
None
Abbie H. B. Ruthrauff
2,952
None
Florence Ruthrauff
675
None
F. Bourne Ruthrauff
275
400
7,100
400
No. of
Shares
Trans-
No. of Shares
Ryan Family
ferred
Retained
Frederick B. Ryan
3,198
none
Elizabeth C. Ryan
1,252
1,700
Frederick B. Ryan, Jr.
50
400
Quincy G. Ryan
50
400
Bruce E. Ryan
150
300 *
4,700
2,800
The employees of R & R who received the total amount of 9,400 shares of common stock toward the end of 1943 from the Ruthrauff estate and members of the Ruthrauff and Ryan families are set forth below. The following schedule shows the dates of the transfers of the common stock, names of the transferees, including some of the petitioners, and the offices of R & R where each was employed: Date of Stock
No. of
Transfer
Shares
Transferee
Office
12-2-43
1,600
Everett J. Grady
New York
12-2-43
1,600
R. F. Sullivan
New York
12-2-43
400
Heagan Bayles
New York
12-2-43
400
Donald Stauffer
New York
12-2-43
1,600
C. J. McCarthy
New York
12-2-43
400
F. C. Bruns
New York
12-2-43
300
Ralph Van Buren
New York
12-2-43
1,600
Paul E. Watson *
Chicago
12-2-43
450
Wm. P. Littell *
Chicago
12-2-43
250
M. J. McGowan
Chicago
12-2-43
200
Kenneth Stewart *
Chicago
12-2-43
200
R. W. Metzger *
Chicago
12-2-43
100
Donald Willis *
Chicago
12-2-43
100
Carlyle Emery *
Chicago
12-2-43
100
Royden Rice *
Chicago
12-2-43
100
Oscar Zahner *
St. Louis
9,400
*54 The new form of certificates of stock of R & R was issued at the time employees of R & R acquired common stock. The new certificates bore the printed clause, quoted above, stating that the shares of stock represented by the certificate are subject to the terms of the repurchase agreement with R & R so that the sale, transfer, or other disposition of such shares was limited and restricted as provided in the agreement. The certificates for shares of common stock which were issued to the 16 employees listed above were dated December 2, 1943, and the transfers of the shares to such employees were made on the corporation's stock books on that date. The new preferred stock was issued either at about the same time as the new common stock or early in 1944 to the Ruthrauff estate and members of the Ruthrauff and Ryan families so that each group received 7,500 shares of preferred stock, a total of 15,000 shares, and the estate and the members of both families received the same number of shares of new preferred stock as the number of shares of the old common stock which each had held prior to December 2, 1943, as has been set forth above. The Ruthrauff estate and family and the *55 Ryan family retained all of the preferred stock. The abbreviated balance sheet of R & R for December 31, 1943, showed total assets of $2,501,056.26; total liabilities and reserves of $1,892,753.47; and capital, earned surplus, and treasury stock of $608,302.79. The capital account was as follows as of December 31, 1943: Capital stock: 15,000 shs. no par pfd. stock,
liquidation value $100 per
share
$ 15,000.00
15,000 shs. no par common
stock
100,000.00
$115,000.00
Earned surplus
505,802.79
$620,802.79
Less treasury stock at cost,
2,500 shs. *
12,500.00
$608,302.79
All of the individuals who received the new common stock executed consents agreeing to be bound by the repurchase agreement of November 22, 1943. Acquisition of Common Stock by Petitioners After 1943 Paul E. Watson and Royden V. Rice did not acquire any additional shares of common stock of R & R after 1943. Littell, Emery, Stewart, Willis, Metzger, and Zahner acquired *56 additional shares of common stock in 1945 and 1946 for which they paid $5 per share. The additional shares of stock were purchased from R & R. In a few instances voting trust certificates were purchased presumably from the holders of such voting trust certificates. Ketting acquired shares of common stock in 1945 and 1946. Groseth acquired shares of common stock in 1946, and Vanderbie acquired shares of common stock in 1947. They paid $5 per share to the corporation for the shares of stock. In every instance, the petitioners executed consents agreeing to the provisions of the repurchase agreement. The following schedule shows the number of shares of common stock acquired by each of the petitioners, the years in which the shares were acquired, and the total amount paid by each for all of the shares acquired: Number of Shares
Total
Total
Petitioners
1943
1945
1946
1947
Shares
Paid
Paul Watson
1,600
0
0
0
1,600
$ 8,000
Littell
450
50
550
0
1,050
5,250
Stewart
200
50
500
0
750
3,750
Metzger
200
50
150
0
400
2,000
Emery
100
50
150
0
300
1,500
Rice
100
0
0
0
100
500
Willis
100
50
50
0
200
1,000
Willis
100
50
50
0
200
1,000
Zahner
100
50
50
0
200
1,000
Ketting
0
50
350
0
400
2,000
Groseth
0
0
100
0
100
500
Vanderbie
0
0
0
150
150
750
2,850
350
1,900
150
5,250
$26,250 All of the shares of *57 common stock which each of the petitioners acquired were assigned, transferred, and delivered to the trustees of the common stock voting trust and voting trust certificates were delivered in exchange. Every person who had shares of common stock of R & R standing in his name, including all of the petitioners, at any time during the years 1943-1947, inclusive, consented and agreed to the repurchase agreement of R & R. Every person who received certificates for the new common stock, i.e., all who held shares of common stock during the years 1943-1947, inclusive, transferred the stock certificates to the voting trust trustees, and voting trust certificates were issued in exchange for the same number of shares of common stock. All of the holders of the new common stock were asked to transfer their certificates to the voting trust trustees, and they did so. The R & R corporation held 2,500 shares of the new common stock in its treasury at the end of 1943. At the end of 1944 it held 2,700 shares the additional 200 shares having been purchased at $5 per share from Bruce E. Ryan. At the end of 1945, the corporation held as treasury stock 1,200 shares of common stock; at the end of 1946 and *58 1947, it held 50 shares, only. During the years 1943-1947, inclusive, every person who held the new common stock of R & R was an employee of the corporation except Elizabeth C. Ryan, who received 1,700 shares of the new common stock on December 2, 1943. She is the wife of Frederick B. Ryan, president. She transferred 1,700 shares to the voting trust trustees on December 22, 1943, in exchange for a voting trust certificate for the same number of shares. As is set forth hereinafter, Paul Watson transferred 1,300 shares of the new common stock to his wife and two children, respectively, on January 10, 1944, so that he retained only 300 shares. Stewart transferred 700 shares to his wife and kept 50 shares. Each of the rest of the petitioners transferred all of the shares of common stock to a member or members of his family, or to a trust for the benefit of children. When dividends were paid on the shares of common stock during the years 1944-1947, inclusive, Watson and Stewart received dividends on the number of shares, respectively, which each had retained. Otherwise, the transferees of the shares of the common stock acquired by Watson, Stewart, and all of the other petitioners received *59 the distributions which were made during the years 1944-1947, inclusive, on the shares of the common stock which were held by the trustees of the voting trust. Directors of R & R, 1942-1943 As of September 25, 1942, and October 14, 1943, the petitioner, Paul E. Watson, was a director of R & R, at which time he was not a stockholder. At the meeting of the board of directors held on October 14, 1943, the petitioner, William P. Littell, was elected a director of R & R, at which time he was not a stockholder. The directors of R & R as of September 25, 1942, and October 15, 1943, and the offices where each one was employed, were as follows: Sept. 25, 1942
Frederick B. Ryan
(New York)
Frederick B. Ryan, Jr.
(New York)
F. Bourne Ruthrauff
(New York)
R. F. Sullivan
(New York)
R. Van Buren
(New York)
Everett J. Grady
(New York)
C. J. McCarthy
(New York)
Joseph R. Busk
(unknown)
Paul E. Watson
(Chicago)
Oct. 15, 1943
Frederick B. Ryan
(New York)
Frederick B. Ryan, Jr.
(New York)
F. Bourne Ruthrauff
(New York)
R. F. Sullivan
(New York)
R. Van Buren
(New York)
Everett J. Grady
(New York)
C. J. McCarthy
(New York)
F. C. Bruns
(New York)
Paul E. Watson
(Chicago)
William P. Littell
(Chicago) Directors of R & R, 1944-1947 The three voting *60 trustees, Frederick B. Ryan, Everett J. Grady, and F. Bourne Ruthrauff (who, also, were directors), elected the directors of R & R in each of the years 1944-1947, inclusive, since all of the shares of the voting common stock were held by them during those years. In 1944 and 1945 there were 12 directors, an increase of 2, compared to the 10 in 1943. The directors in 1945 were the same persons as served in 1944. In 1946 there were 13 directors, and in 1947 there were 10. During the 6 years, 1942 through 1947, 6 individuals served as directors throughout, namely, Frederick B. Ryan, Frederick B. Ryan, Jr., F. Bourne Ruthrauff, R. Van Buren, Everett J. Grady, and C. J. McCarthy. William P. Littell was a director during the 5 years, 1943 through 1947. R. F. Sullivan served during the 5 years, 1942 through 1946. Paul E. Watson served during the 6 years, 1942 through 1947. During the period 1942-1947, inclusive, the only directors who were members of the Ryan or the Ruthrauff families, or were related thereto, were Frederick B. Ryan, Frederick B. Ryan, Jr., and F. Bourne Ruthrauff. None of the other directors were related to those families. The directors during 1944 and 1945, 1946, and 1947, *61 and the offices where each was located, were as follows: 1944-1945
Frederick B. Ryan
(New York)
Frederick B. Ryan, Jr.
(New York)
F. Bourne Ruthrauff
(New York)
R. F. Sullivan
(New York)
R. Van Buren
(New York)
Everett J. Grady
(New York)
C. J. McCarthy
(New York)
F. C. Bruns
(New York)
Heagan Bayles
(New York)
D. Stauffer
(New York)
William P. Littell
(Chicago)
Paul E. Watson
(Chicago)
1946
Frederick B. Ryan
(New York)
Frederick B. Ryan, Jr.
(New York)
F. Bourne Ruthrauff
(New York)
R. F. Sullivan
(New York)
R. Van Buren
(New York)
Everett J. Grady
(New York)
C. J. McCarthy
(New York)
F. C. Bruns
(New York)
Heagan Bayles
(New York)
D. Stauffer
(New York)
William P. Littell
(Chicago)
Paul E. Watson
(Chicago)
Kenneth D. Stewart
(Chicago)
1947
Frederick B. Ryan
(New York)
Frederick B. Ryan, Jr.
(New York)
F. Bourne Ruthrauff
(New York)
R. Van Buren
(New York)
Everett J. Grady
(New York)
C. J. McCarthy
(New York)
F. C. Bruns
(New York)
William P. Littell
(Chicago)
Paul E. Watson
(Chicago)
Kenneth D. Stewart
(Chicago)
Dividends Paid and Earnings of R & R, 1943-1947 In 1943, R & R declared and paid cash dividends on the then outstanding 15,000 shares of old common stock, which was held by the members of the Ruthrauff and Ryan families, in the total amount of *62 $100,000, and the stock dividend of 15,000 shares of new, 7 per cent, preferred stock (which was valued at $1 per share) in the amount of $15,000. The new preferred stock was distributed as follows: Shares of Preferred Stock
Estate of W. B. Ruthrauff
3,198
Abbie H. B. Ruthrauff
2,952
F. Bourne Ruthrauff
675
Florence Ruthrauff
675
Frederick B. Ryan
3,198
Elizabeth C. Ryan
2,952
Frederick B. Ryan, Jr.
450
Quincy G. Ryan
450
Bruce E. Ryan
450
15,000
During the years 1944 and 1945, dividends $7of per share were paid on the preferred stock. Dividends on the preferred stock for 1946 were paid to June 30, 1946. Payment of dividends on the preferred stock for the last half of 1946 and the first half of 1947 were waived by the preferred stockholders. Dividends for the last half of 1947 were declared on February 10, 1948, and were payable on March 15, 1948. Accordingly, no preferred stock dividends were paid during 1947. The total amount of preferred stock dividends which was paid in each of the years 1944, 1945, and 1946 was $105,000. During each of the years 1944-1947, inclusive, cash dividends of $5 per share were declared and paid semiannually on the issued and outstanding new common stock, all of which was *63 held by the voting trustees, so that $10 per share was paid in each year. The first common stock dividend of $5 per share was declared on February 1, 1944, and was paid on February 5, 1944. As the holders of voting trust certificates were entitled to receive cash equal to the dividends declared on the common stock, such dividends were paid to the holders of the voting trust certificates. The dividends were paid directly to the holders of voting trust certificates by checks of R & R; the dividends were not paid first to the voting trustees. The only duties performed by the voting trustees were the election of directors. The distribution of dividends and the keeping of all records for the voting trustees was done by employees of R & R. The dates on which dividends on the new common stock were paid during the years 1944-1947, inclusive, were as follows: February 5 and July 20, 1944; February 5 and July 10, 1945; February 5 and July 15, 1946; and February 17 and September 1, 1947. Of course, dividends were not paid on the shares of common stock held in the treasury of R & R. According to the balance sheets of R & R as of December 31 of 1943, 1944, 1945, 1946, and 1947, the total number *64 of shares of common stock held as treasury stock at the end of each of those years was 2,500 shares, 2,700 shares, 1,200 shares, 50 shares, and 50 shares, respectively. However, as is shown below, during 1945 and 1946, at the time dividends were declared, there were 1,950 and 2,800 shares, respectively, of common stock held as treasury stock. R & R exercised its right to repurchase its common stock at $5 per share under the repurchase agreement, in all situations where such right arose. During the period 1944-1947, inclusive, R & R issued shares of the new common stock to others than the petitioners. The following schedule shows the amount of common stock cash dividends paid during 1944, 1945, 1946, and 1947, the number of shares of common stock which were issued and held by the voting trust trustees on which the dividends were declared, and the number of shares of common stock held as treasury stock at the time dividends were declared: Total
Common
Total
Shares
Stock
Shares
In Treas-
Year
Dividends
Issued
ury
1944
$123,000
12,300
2,700
1945
130,500
13,050
1,950
1946
122,000
12,200
2,800
1947
149,500
14,950
50
The following schedule summarizes the amounts of dividends paid in cash and in preferred stock during *65 the years 1943-1947, inclusive: Preferred
Common
Total
Stock
Stock
Cash
Year
Dividends
Dividends
Dividends
1943
$ 15,000 *
$100,000
$115,000
1944
105,000
123,000
228,000
1945
105,000
130,500
235,500
1946
105,000
122,000
227,000
1947
none
149,500
149,500
The net earnings after Federal taxes of R & R for the years 1943-1947, inclusive, were as follows: 1943
$239,665.54
1944
215,328.65
1945
233,672.93
1946
184,996.23
1947
217,806.21
The average net profit of R & R for the 5 years, 1939-1943, inclusive, was $212,679.32. The following schedule shows the amount of the balance of the earned surplus of R & R after the payments of dividends at the end of the years 1942-1947, inclusive: Balance of
Earned
December 31
Surplus
1942
$381,137.25
1943
505,802.79
1944
493,131.44
1945
463,640.17
1946
421,556.92
1947
541,026.88 The book value of R & R on December 31, 1942, and on December 31, 1943 (including reserves for contingencies), was $619,144.84 and $621,654.23, respectively. Transfers of New Common Stock to the Voting Trust in 1943-1944 The following schedule shows the names of those who made transfers of the new common stock to the voting trust trustees, the number of shares transferred, the dates on which the shares were received, *66 and the dates on which the transfers were made to the voting trust trustees: Date Transferred
No. of
Date Re-
to Voting
Transferor
Shares
ceived [2]
Trust
Elizabeth C. Ryan
1,700
12- 2-43
12-22-43
Frederick B. Ryan, Jr.
400
12- 2-43
1-31-44
F. Bourne Ruthrauff
400
12- 2-43
1-31-44
Quincy G. Ryan
400
12- 2-43
1-31-44
[3] *67 2,900 Mary C. Grady
1,600
12-28-43
12-28-43
Marion Sullivan
1,600
12-22-43
12-29-43
Gladys Bayles
400
12-24-43
12-24-43
Cynthia Stauffer
400
12-29-43
1-11-44
Agnes B. McCarthy
1,600
12-23-43
1-21-44
Viola Bruns
400
12-27-43
1-21-44
Ralph Van Buren
300
12- 2-43
12-22-44
Louise P. Saunders (from M. J.
McGowan)
250
1-10-44
1-21-44
[1]Paul E. Watson 300
12- 2-43
1-21-44
[1]Nelle G. Watson 1,000
1-10-44
1-21-44
[1]Lorraine W. Parsons 150
1-10-44
1-21-44
[1]William Watson 150
1-10-44
1-21-44
[1]Sarah E. Littell 450
1- 4-44
1-21-44
[1]Grace G. Stewart 200
1- 4-44
1-21-44
[1]Adrienne G. Metzger 200
1-20-44
1-21-44
[1]Eina C. Willis 100
1-21-44
1-21-44
[1]Eve G. Emery 100
1- 4-44
1-21-44
[1]Elsie K. Rice 100
1-21-44
1-21-44
[1]Dorothy C. Zahner 100
1-31-44
1-31-44
On January 13, 1944, at the latest, it was known in the office of R & R that Nelle G. Watson, Lorraine W. Parsons, William D. Watson, Sarah E. Littell, Grace G. Stewart, Adrienne G. Metzger, Elna C. Willis, Eve G. Emery, Elsie K. Rice, and Dorothy C. Zahner would transfer shares of common stock, which originally had been issued to their husbands (or father, in the instance of Lorraine W. Parsons and William D. Watson), to the voting trust trustees, and a memorandum was prepared in the office of R & R which showed the number of shares of new common stock which each of the above-named individuals would transfer to the voting trust trustees and the dollar amounts of the New York and United States stock transfer stamps which would be required for such transfers of stock. The R & R corporation expected each of the petitioners to pay for the State and Federal stock transfer stamps which were required in connection with the original transfers to them of the new common stock of R & R. Consents to Repurchase and Voting Trust Agreements Consent to the repurchase agreement of November 22, 1943, was made by the execution of a written, supplemental form of consent which was *68 executed by R & R, by its president, and by every person who acquired the new common stock of R & R. All holders of shares of the new common stock of R & R became parties to the voting trust agreement of November 22, 1943, by depositing certificates for shares of common stock with the trustees of the voting trust at a later date. The following schedule shows the dates on which 8 of the petitioners, and those to whom they transferred shares of common stock, executed written consents "to be bound by the terms and provisions of" the repurchase agreement. The other petitioners, Ketting, Groseth, and Vanderbie, and their respective assignees of common stock, also executed the written consents. Dates of Execution of Consents to Repurchase Agreement
Date
Employee
Date
Assignee
1- 4-44
Paul E. Watson
1-21-44
Nelle G. Watson
1-21-44
Lorraine W. Parsons
1-21-44
William Watson
1- 4-44
Littell
1-21-44
Sarah E. Littell
1- 4-44
Stewart
1-21-44
Grace G. Stewart
1- 4-44
Metzger
1-21-44
Adrienne G. Metzger
1-10-44
Emery
1-21-44
Eve G. Emery
1-10-44
Rice
1-21-44
Elsie K. Rice
1-10-44
Willis
1-21-44
Elna C. Willis
1- 5-44
Zahner
1-21-44
Dorothy C. Zahner Relationship of Members of Ruthrauff and Ryan Families Wilbur B. Ruthrauff and Abbie *69 H. B. Ruthrauff were the parents of Florence and F. Bourne Ruthrauff. Frederick B. Ryan and Elizabeth C. Ryan are the parents of Frederick B. Ryan, Jr., Quincy G. Ryan, and Bruce E. Ryan. General All financial matters of R & R were handled in its office in New York City. Prior to the decision by those who controlled R & R to make the new common stock available to selected, key personnel, the president, Frederick B. Ryan, had discussions with various officers and employees about the matter, whose names have been set forth above, and with the then holders of the old common stock. The members of an informal group, a so-called committee which included Paul E. Watson, made recommendations to Ryan about which key employees might be selected as those who would receive the new common stock. Watson made recommendations with respect to particular employees in the Chicago office and other offices in the western division, but he did not make any recommendation as to the number of shares of the new common stock which might be made available to any particular employee. Ryan told Watson how many shares of the new common stock would be made available to him and that Abbie H. B. Ruthrauff was willing *70 to sell some of her stock to him. Members of the two families were given the names of which employees would purchase some of their stock. Watson informed Littell that he could purchase common stock from members of the two families. From time to time the corporation purchased common stock under the repurchase agreement. After 1947, the purchase price was the book value of the stock. After 1945, Frederick B. Ryan was less active in the corporation's business and eventually he retired. His salary was $100,000 in 1943; it was reduced to $27,500 in 1948. He died at some time after 1948 and before the trial of these cases. No part of the cash dividends paid by R & R during the years 1944-1947, inclusive, on the new common stock which was held in the voting trust was deducted, or claimed, by the R & R corporation as salary or other expense in its income tax returns. The common stock on which the preferred stock dividend was paid was not traded on any market and, therefore, did not have any market price. Particular facts relating to each of the petitioners are as follows: Paul E. Watson Paul E. Watson, who is now over 70 years of age, was first employed by R & R in 1921, and he has been *71 so employed for over 35 years in the Chicago office where he was the manager for the western division. He became an executive vice-president. Although he was not a stockholder prior to December 1943, he was elected a director and he held that position on September 25, 1942, and throughout 1943, and thereafter through 1947. Watson became a member of the committee which managed the Employees' Profit-Sharing Plan after that plan was adopted on October 25, 1943. The wife of Watson is Nelle G. Watson, and their children are Lorraine W. Parsons and William D. Watson. Lorraine W. Parsons was married in 1939 to Keith I. Parsons, and she has lived in her own home, apart from her parents, since the time of her marriage. William D. Watson was married in 1937, and he has lived in his own home since he was married. William D. Watson was employed by R & R in 1939 and he has been employed by that corporation ever since. In 1943, he was an accounts executive; later he became a vice-president and director. He was about 30 years old at the beginning of 1944. On December 1, 1943, Paul E. Watson acquired 1,600 shares of R & R common stock for which he paid $5 per share, $8,000, and a stock certificate *72 dated December 2, 1943, for 1,600 shares was issued to him. The stock certificate was for the new common stock and bore the statement that the stock was subject to a repurchase agreement with R & R, to which agreement Watson agreed to be bound on January 4, 1944. The 1,600 shares of stock which were issued to Watson came out of the block of the old common stock of Abbie H. B. Ruthrauff, the widow of Wilbur B. Ruthrauff, who held 2,952 shares. However, Watson never had any dealings, negotiations, or discussions with Abbie Ruthrauff about the purchase of stock from her. He knew that the stock was available to him through Abbie Ruthrauff. On January 10, 1944, Watson assigned and transferred 1,000 shares to his wife, 150 shares to his daughter, and 150 shares to his son, and he retained 300 shares. New certificates were thereupon issued in the respective amounts to Watson, his wife, and his two children. The four, new stock certificates were dated January 20, 1944. Nelle Watson paid her husband $5 per share, $5,000, for the stock; nothing was paid to Watson by either one of the children. Paul Watson, Nelle Watson, and both of the children executed written consents to the common stock repurchase *73 agreement. On January 21, 1944, all deposited their stock certificates in the voting trust, and on January 31, 1944, each received a voting trust certificate in the same amount as the number of shares he, or she, had deposited in the trust. Of the cash dividends in the amount of $16,000 each year paid by R & R on the 1,600 shares of common stock during the years 1944 through 1947, Nelle Watson received in each year $10,000 on 1,000 shares; Paul E. Watson received $3,000 per year on 300 shares; Lorraine Parsons received $1,500 per year on 150 shares; and William Watson received $1,500 per year on 150 shares. Nelle Watson had her own individual and separate bank account, which her husband did not have any power to draw upon or sign checks. She deposited in her own bank account all of the dividends paid in 1944-1947, inclusive, on the 1,000 shares of R & R stock. The dividends were paid to her by R & R. She reported them in her individual income tax returns and paid the income tax thereon. She used the funds represented by the dividends for the payment of her income taxes, and for the purchase of securities which were issued, or registered, in her name. None of the dividends received *74 on the R & R stock which Nelle Watson received were turned over to Paul E. Watson or used for household or other expenses for which Watson was responsible. The transaction whereby Nelle Watson received assignment of 1,000 shares of R & R common stock from her husband was financed in the following way: On January 28, 1944, Nelle Watson received an advance of $6,000 from Virgil Whipp, the executor of the estate of her father, which she deposited in her own bank account. She withdrew $5,000 from her bank account on January 31, 1944, which she paid to Watson by her check dated January 31, 1944, for 1,000 shares of R & R stock. On February 5, 1944, Nelle Watson received a dividend of $5 per share on the 1,000 shares of stock, $5,000, which she deposited in her bank account. On February 10, 1944, she repaid to Virgil Whipp $5,025 of the advance from her father's estate. During the years 1944-1947, inclusive, dividends on the shares of stock deposited in the voting trust by Watson's children, William and Lorraine, were paid directly to them; each deposited the dividends in his and her own bank account, reported them in his and her income tax return, and paid income tax thereon. The dividends *75 received by William and Lorraine were used by each of them for the payment of income tax and personal uses, and none of such funds were turned over to their father, Paul E. Watson. Paul E. Watson was paid a salary by R & R in the amount of $51,221 in 1944, and $54,300 in each of the years 1945, 1946, and 1947. These amounts were comparable to salaries then being paid to executives doing similar work by other advertising agencies. As of the time of the trial of these cases, Paul E. Watson still held 300 shares of R & R common stock; Nelle Watson still held 1,000 shares; Lorraine Parsons still held 150 shares; and William Watson still held 150 shares. The respondent determined that the payments in each of the years 1944-1947, inclusive, by R & R to Watson's wife, son, and daughter in the total amount of $13,000 in each year is taxable to Watson under section 22(a) either as compensation for services or as dividends, as follows: Paid to
Paid to
Paid to
Year
Wife
Son
Daughter
Total
1944
$10,000
$1,500
$1,500
$13,000
1945
10,000
1,500
1,500
13,000
1946
10,000
1,500
1,500
13,000
1947
10,000
1,500
1,500
13,000 William P. Littell Littell has been an employee of R & R, in its Chicago office, since 1922, a period of *76 over 34 years. He was appointed a vicepresident in 1933, and he became a director in October 1943. He was the manager of the Chicago office, and assisted in the hiring of employees. Anne F. Littell is his wife, and Sarah E. Littell is his sister. His children are Joan and William, Jr. Littell acquired, for $5 per share, 1,050 shares of new common stock of R & R during 1943, 1945, and 1946 for the total sum of $5,250. He acquired 450 shares in 1943, 50 shares in 1945, and 550 shares in 1946. He was told by Watson or some other executive of R & R that common stock of R & R was available for acquisition by him. He did not have any voice in the matter or in the corporation's policy with respect to sales of stock to key employees. The total amounts of the dividends paid in the years 1944-1947 were as follows: 1944
$ 4,500
1945
4,750
1946
5,000
1947
10,500
$24,750 None of the dividends was paid to Littell; they were paid to Sarah E. and Anne F. Littell. At the end of 1947 voting trust certificates for 1,050 shares of common stock were held as follows: A voting trust certificate was held by Sarah E. Littell which represented 150 shares of common stock originally acquired by Littell; voting trust *77 certificates were held by Anne F. Littell which represented 350 shares originally acquired by Littell; and a trust created on January 6, 1947, by Anne F. Littell for the benefit of the two children, of which William P. Littell was the trustee, held a voting trust certificate for 550 shares of stock. The 1.050 shares of stock were acquired by Littell and were transferred under the following circumstances: The 450 shares acquired by Littell on December 2, 1943, were received from Florence B. Ruthrauff, who transferred to Littell 177 shares; from F. Bourne Ruthrauff, who transferred 223 shares; and from Frederick B. Ryan, Jr., who transferred 50 shares. Stock certificates for all of these shares were issued to Littell in his name, and on January 4, 1944, he executed a consent to be bound by the repurchase agreement of R & R. On January 4, 1944, Littell assigned and transferred the 450 shares to his sister, Sarah, and a new stock certificate for such shares was issued on January 20, 1944, to Sarah in her name. On January 21, 1944, Sarah assigned and transferred the 450 shares to the voting trust trustees, and on January 31, 1944, a voting trust certificate representing the 450 shares was *78 issued to Sarah and was held by her. Sarah Littell paid her brother $5 per share for the 450 shares, or $2,250, as follows: On January 5, 1944, Sarah gave Littell a note having that date for $900, due in one year and bearing 3 per cent interest. She gave him at the same time another 3 per cent note dated January 5, 1944, and due 2 years later, for $922. On January 12, 1944, she gave him her check for $500. On June 15, 1945, she gave Littell her check for $1,903.66 in payment of her two notes, plus interest. Littell received from Sarah for the 450 shares $2,403.66, which represented $5 per share, $2,250, plus interest in the amount of $153.66. Littell did not have a joint bank account with Sarah, and he did not have any power to sign any checks drawn on her bank account. On June 19, 1945, Sarah surrendered to the trustees of the voting trust the voting trust certificate for 450 shares, and in place of it two new voting trust certificates were issued. One certificate representing 300 shares of common stock was issued to Anne F. Littell. Another certificate representing 150 shares was issued to Sarah. On February 15, 1945, Littell acquired 50 shares of common stock from the R & R corporation, *79 and he paid R & R $250, or $5 per share. On that date a common stock certificate for 50 shares was issued to Littell. On February 28, 1945, Littell transferred these shares to the voting trust trustees, and he received a voting trust certificate. On March 12, 1945, Littell transferred the voting trust certificate to his wife Anne; and on March 20, 1945, she surrendered the certificate to the voting trust trustees who issued, in her name, a new voting trust certificate to her representing 50 shares of common stock. Anne did not pay any consideration to Littell for the assignment of the voting trust certificate to her. On December 20, 1946, Littell acquired from the R & R corporation 450 shares of common stock, for which a common stock certificate in his name was issued to him. He paid the corporation $2,250, $5 per share, for the stock. Also, on the same date, Littell acquired a voting trust certificate representing 100 shares of common stock, for which he paid $500. On December 20, 1946, Littell received a new voting trust certificate in his own name representing 100 shares of stock. With respect to the 450 shares of stock, Littell assigned the stock certificate to the voting trust *80 trustees on December 23, 1946, and received a voting trust certificate in exchange. On January 17, 1947, Littell assigned the two above-described voting trust certificates representing 550 shares of common stock to his wife, Anne; the voting trust certificates were cancelled by the voting trust trustees, who issued a new voting trust certificates representing 550 shares of common stock to Anne F. Littell. By a check dated February 19, 1947, drawn on The South Shore National Bank of Chicago, Anne paid Littell $2,750 for the assignment to her of the voting trust certificates representing 550 shares of common stock. A trust agreement dated January 6, 1947, between Anne F. Littell, as the grantor, and William P. Littell, as the trustee, was executed by Anne and Littell. The trust is known as the Anne Fithian Littell Trust. The provisions of the trust agreement are referred to hereinafter. The beneficiaries of the trust are Joan Littell and William P. Littell, Jr. On September 10, 1947, Anne F. Littell assigned the voting trust certificate for 550 shares of stock to William P. Littell, as trustee; the voting trust certificate was surrendered to the trustees of the voting trust, who issued *81 a new voting trust certificate on the same date to William P. Littell as trustee for Joan Littell and William P. Littell, Jr. At some time $5,000 in cash was transferred to the trust, so that the trust corpus consisted of cash and the voting trust certificate for 550 shares. The Anne F. Littell trust is an irrevocable trust. It is to terminate 5 years after the death of William P. Littell. The trust assets then are to be distributed equally to Joan and William, Jr., but if neither should be living, then to Anne F. Littell. The settlor of the trust may make additional transfers of property to the trust. The income of the trust may be paid to the children or used for their benefit, and principal may be paid to them or for their benefit, if trust income is inadequate, in the discretion of the trustee. During the minority of a beneficiary payments from trust income or principal may be paid to them or to a legal guardian. None of the income or principal may be paid to the settlor of the trust or to the trustee for the use or benefit of either, and neither has ever received any payments from the trust. Dividends on the 550 shares during 1947 were received by Anne who paid them over to the *82 trust. A bank account was opened for the trust. The dividends were deposited in the trust's bank account. The trustee has maintained the trust's accounting records. A fiduciary income tax return for the trust was filed for 1947 on which dividends of $5,500 were reported. In 1947, after the trust was created, Joan reached the age of 23 years, and William, Jr., was about 17. Except for the payment of income tax and trust expenses of not more than $25, no payments out of trust income or principal have been made. The dividends on the common stock involved during 1944-1947 were paid to Sarah and Anne, respectively, in the following amounts, and each reported them in her individual income tax returns, except the dividends paid to the trust: Paid to
Paid to
Date of
Sarah
Anne
Payment
Littell
Littell
Total
Feb. 5, 1944
$2,250
None
July 20, 1944
2,250
None
$4,500
None
$ 4,500
Feb. 5, 1945
$2,250
None
July 10, 1945
750
$1,750
$3,000
$1,750
$ 4,750
Feb. 5, 1946
$ 750
$1,750
July 15, 1946
750
1,750
$1,500
$3,500
$ 5,000
Feb. 17, 1947
$ 750
$4,500 *
Sept. 1, 1947
750
4,500 *
$1,500
$9,000 *
$10,500
Sarah Littell maintains *83 her own home. She had no agreement with Littell about the shares of stock she purchased from him or the dividends. He never has had possession of the stock and voting trust certificates she received, or any interest in the stock represented by them. The certificates were delivered to Sarah and she has maintained control over them. Littell did not have any agreement with Anne concerning the shares he gave her or the shares she purchased from him. He told her the shares he gave her were hers and that she could do with the shares and dividends as she pleased. Littell has not had any control over the gift shares or the shares Anne purchased. Anne Littell deposited the dividends she received under the voting trust certificates in a separate bank account from which her husband did not have power to make withdrawals. Littell had a joint bank account with his wife during the period in question but the dividends paid under the voting trust certificates were not deposited in their joint bank account. No part of the dividends in question was used to pay household or other expenses for which Littell was responsible, or expenses of Littell. No part of the dividends paid to Sarah and Anne have been *84 paid over to Littell for his own use, or used for his benefit. The amounts of the salary (in round figures) paid to Littell by R & R during the years 1940-1948, inclusive, were as follows: Year
Salary
1940
$20,000
1941
25,500
1942
26,309
1943
28,915
1944
28,309
1945
30,238
1946
33,499
1947
36,074
1948
37,291 The amounts of the salary paid to Littell in the years 1944-1947, inclusive, were comparable to salaries paid to executives performing similar services by other advertising agencies. During each of the years 1944-1947, inclusive, Littell's mother, Carrie E. Littell, received more than half of her support from Littell, and her gross income for each year was less than $500. The Commissioner included in Littell's taxable income for the years 1944-1947, inclusive, all of the dividends received by his sister, his wife, and the trust for his children in the total amounts, respectively, of $4,500, $4,750, $5,000, and $10,500, as compensation for services or dividends. Carlyle Emery Carlyle Emery has been engaged in the advertising business since 1926. He has been employed continuously by R & R since August 1933 in its Chicago office as an account executive and salesman. He became a vice-president in 1942 *85 or 1943. He has never been a director and he has never had any voice in the policies of R & R which were adopted relating to the selling of stock to employees, fixing the amounts of salaries, or any other matters. The amounts of salary paid to Emery during each of the years 1940 through 1948 (in round figures) were as follows: Year
Salary
1940
$11,400
1941
13,100
1942
17,304
1943
18,115
1944
17,513
1945
18,148
1946
19,999
1947
25,783
1948
25,000 For the services rendered, the salary paid Emery in each year was comparable to that paid for the same kind of work by other advertising agencies and by R & R to others doing the same work. From 1926 to 1931, Emery was president of and a stockholder in the Emery Advertising Corporation which carried on an advertising agency business. During this period he married Eve G. Emery, who also was a stockholder. In April 1931, the Emery Advertising Corporation was adjudicated bankrupt in an involuntary bankruptcy proceeding which ended in May 1931. Later Emery discharged all of his personal obligations. Eve has maintained her separate bank account since November 2, 1936, in the National Boulevard Bank of Chicago. She still has this bank account. It is not a joint account *86 with her husband. During the years 1943-1947, the amounts of the monthly balances in Eve's personal bank account ranged from about $1,500 to as high as $5,500. Emery has never had a joint bank account with his wife or an individual bank account at the National Boulevard Bank. Eve has made investments in United States Savings bonds since at least 1941 and, from time to time, in stocks of corporations. She has had individual and separate trading accounts with several brokerage firms. She has her own safe deposit box where she keeps her securities. She had the safe deposit box during the years involved here. It has been Emery's custom to make gifts of money to his wife from time to time during their marriage, which she has deposited in her own bank account. On December 2, 1943, a certificate for 100 shares of R & R common stock was issued in Emery's name to him. The stock was purchased from the estate of Wilbur B. Ruthrauff. On January 4, 1944, Emery transferred the shares to his wife and a common stock certificate was issued to her. She deposited the shares in the voting trust on January 21, 1944, and received a voting trust certificate. She executed a consent to the R & R repurchase *87 agreement. She has held the certificate continuously since then and has kept it in her personal safe deposit box. Eve Emery bought 100 shares of common stock. She paid $500 for them with her own money by a check drawn on her individual bank account at the National Boulevard Bank. Eve received all of the dividends paid on these 100 shares. On February 15, 1945, Emery purchased 50 shares of common stock from the corporation for $250. He deposited the shares in the voting trust on February 28th and received a voting trust certificate in exchange. On March 12, 1945, Emery made a gift of 50 shares of stock represented by the voting trust certificate to his wife. A voting trust certificate for 50 shares was issued to her. She had held the voting trust certificate continuously in her safe deposit box. All of the dividends on these 50 shares have been paid to Eve. Prior to December 20, 1946, the corporation repurchased 250 shares of common stock represented by a voting trust certificate which had been purchased originally on December 2, 1943, by an employee, M. J. McGowan. On December 20, 1946, out of this voting trust certificate, a new common stock voting trust certificate for 150 shares *88 of common stock was issued to Emery. After assignment by Emery to his wife, a voting trust certificate for 250 shares of common stock was issued to Eve on January 17, 1947. Eve purchased 250 shares for $750, payment being made by her with her own funds by a check drawn on her individual bank account at the National Boulevard Bank. She has held the voting trust certificate continuously and has kept it in her safety deposit box. She has received all of the dividends paid on these 250 shares. Eve deposited all of the dividends she received on R & R common stock in her individual bank account. During the period 1944-1947, inclusive, Eve invested $9,420.13 of her own funds in United States Savings Bonds and stocks of corporations other than the R & R corporation. She kept all of the securities in her own safe deposit box under her own control. On May 20, 1954, Eve redeemed United States Savings Bonds through the National Boulevard Bank for $18,600, plus interest of $4,461.74, receiving the total sum of $23,061.74. The total amounts of dividends paid to Eve on the R & R stock during the years involved were as follows: Year
Dividends
No. of Shares
1944
$1,000
100
1945
1,250
150
1946
1,500
150
1947
3,000
300
Total
$6,750
Eve *89 filed separate income tax returns for the years 1944-1947 in which she reported the above amounts of dividends paid to her under the voting trust certificates. The Commissioner determined that for each of the years 1944-1947, the dividends were taxable to Carlyle Emery under section 22(a) of the 1939 Code either as additional compensation for his services to R & R, or as his dividends. Howard B. Ketting Howard B. Ketting was employed in the Chicago office of R & R during the years 1940-1948, inclusive. He became a vice-president in 1944. He was not a director at any time here material. His wife is Prudence B. Ketting. On February 15, 1945, Ketting acquired 50 shares of R & R common stock from the corporation for $250 ( $5 per share). He deposited the common stock certificate for 50 shares with the voting trust trustees and received in exchange a voting trust certificate for 50 shares. Ketting received dividends in the amount of $250 on each date dividends were paid after he acquired the 50 shares, i.e., on July 10, 1945, February 5, 1946, and July 15, 1946. Ketting agreed to be bound by the repurchase agreement with R & R. On December 23, 1946, Ketting acquired 350 additional shares *90 of R & R new common stock for $1,750 ( $5 per share). On January 17, 1947, Ketting assigned and transferred to his wife, Prudence, certificates representing 400 shares of common stock of R & R. Prudence did not pay her husband any consideration for such transfers. At some time, Prudence agreed to be bound by the common stock repurchase agreement of R & R. At some time, a common stock voting trust certificate (or certificates) representing the deposit of 400 shares of common stock in the voting trust was (or were) issued by the voting trust trustees to Prudence B. Ketting. In 1947, the total amount of dividends paid under the voting trust certificate on 400 shares was $4,000, of which $2,000 was paid on February 17, 1947, and $2,000 was paid on September 2, 1947. The dividends were paid to Prudence Ketting. Howard B. Ketting had a bank account in the Continental Illinois National Bank and Trust Company of Chicago. The account was opened on September 14, 1945, and it was in existence during the remainder of 1945, during 1946 and 1947, and it was not closed until February 3, 1954. He deposited in this bank account dividends paid to him on February 5, 1946, and July 16, 1946, in the amounts *91 of $250, respectively, on 50 shares. Prudence Ketting opened a bank account on January 16, 1945, in the National Boulevard Bank of Chicago, which account was in existence thereafter through 1946, 1947, and subsequent years. The signature card for this account dated January 16, 1945, is signed by Prudence, only. With respect to dividends paid during 1947 by R & R relating to 400 shares of common stock for which a voting trust certificate (or certificates) was (were) issued to Prudence, in her name, the check of R & R, payable to Prudence B. Ketting, dated February 17, 1947, for $2,000, was endorsed as follows: Prudence B. Ketting, Howard B. Ketting, pay the Continental, IllinoisNational, Bank & Trust Co., of Illinois
Prudence endorsed the above check and gave it to her husband who deposited the check in his own bank account. The check of R & R dated September 2, 1947, payable to Prudence B. Ketting, for $2,000, was endorsed as follows: Pay to, National Boulevard, Bank of Chicago, Prudence B. Ketting Prudence deposited the dividend of September 2, 1947, in her above-described bank account. Howard B. Ketting was paid salary (in round figures) by R & R during the years 1940-1948, inclusive, *92 in the following amounts: Year
Salary
1940
$ 1,569
1941
7,149
1942
7,884
1943
9,944
1944
10,833
1945
20,384
1946
22,468
1947
33,467
1948
30,000
Ketting and his wife filed separate income tax returns for 1947. In her income tax return for 1947, Prudence Ketting reported gross income in the amount of $4,060, which included $4,000 received as dividends from R & R during 1947. No dividends were reported by Ketting in his individual return. The Commissioner included in Howard B. Ketting's taxable income for 1947 the sum of $4,000, and determined that he was taxable on the full amount as compensation for services or dividends under section 22(a). Kenneth D. Stewart Kenneth D. Stewart has been employed in the Chicago office of R & R since the year 1940, at least. His position during the taxable years 1944-1947, inclusive, was that of an account executive. During the years 1943-1947, inclusive, he was a vice-president. He was a director of R & R in 1946 and throughout 1947. The amounts of salary and bonuses which R & R paid to Stewart during the years 1940 through 1948 were (in round figures) as follows: Year
Salary
1940
$18,500
1941
18,500
1942
20,913
1943
23,390
1944
23,413
1945
24,444
1946
25,000
1947
30,733
1948
37,500
Grace *93 G. Stewart is the wife of Stewart. Stewart and his wife filed separate income tax returns for each of the years 1944-1947, inclusive. On December 2, 1943, Stewart acquired 200 shares of new common stock of R & R for $1,000 ( $5 per share). These shares were acquired from F. Bourne Ruthrauff, 52 shares, Bruce E. Ryan, 50 shares, and the Estate of Wilbur B. Ruthrauff, 98 shares. A common stock certificate for 200 shares was issued to Stewart, in his name. On January 4, 1944, Stewart assigned the 200 shares to his wife, without receiving any payment from her, and a new stock certificate was issued to her in her name. On January 21, 1944, Grace assigned the 200 shares to the voting trust trustees and received a common stock voting trust certificate for 200 shares. Dividends of $2,000 were paid under this voting trust certificate in each of the 4 years, 1944-1947, inclusive. Stewart executed a consent to be bound by the common stock repurchase agreement on January 4, 1944, and Grace executed such consent on January 21, 1944. On February 15, 1945, Stewart acquired from R & R 50 shares of common stock, out of the stock held in its treasury, for $250 ( $5 per share). Stewart received a stock *94 certificate in his name for 50 shares, which he assigned to the voting trust trustees on February 28, 1945, and he received a voting trust certificate for 50 shares in exchange. Stewart retained during the years here involved this voting trust certificate, and dividends paid under the certificate were paid to him. During 1945 Stewart received $250 on July 10, 1945, as a dividend, which he reported in his separate income tax return for 1945. In 1946 and 1947 he received $500, in each year, as dividends under the voting trust certificate, which he reported in his separate returns. On December 20, 1946, Stewart acquired from R & R 400 shares of common stock out of the corporation's treasury stock, and a voting trust certificate representing 100 shares of common stock. Payment for this 500 shares of common stock was made to R & R by two checks for $1,250, each, issued by Grace G. Stewart. One check was dated February 25, 1947, and the other was dated September 29, 1947. Each check was made payable to R & R, and each check was drawn on Grace Stewart's separate and individual checking account with the Calumet National Bank of Hammond, which is located in Hammond, Indiana. The total sum of *95 $2,500 represented payment of $5 per share for 500 shares. Grace Stewart opened an individual checking account with the Calumet National Bank prior to 1937. She has maintained the checking account continuously to the present. Withdrawals from the bank account could be made under the signature of Grace G. Stewart, only; it is not, and never has been, a joint bank account with Grace's husband. With respect to the 400 shares of R & R common stock, and the voting trust certificate for 100 shares: Stewart received a common stock certificate for 400 shares which he assigned to the voting trust trustees on December 23, 1946, for which he received a voting trust certificate for 400 shares. On January 17, 1947, Stewart assigned to Grace the voting trust certificate for 400 shares and the voting trust certificate representing 100 shares. On January 17, 1947, a voting trust certificate representing 500 shares was issued to Grace in exchange for the certificates for 400 and 100 shares. On February 17, 1947, $2,500 was paid under the voting trust certificate for 500 shares as a dividend; and on September 1, 1947, $2,500 was paid under the same certificate as a dividend, so that in 1947 $5,000 was *96 paid under this voting trust certificate. To summarize the above: From December 2, 1943, to December 20, 1946, Stewart acquired 750 shares of common stock, which were represented by voting trust certificates, for which voting trust certificates representing 700 shares were issued to Grace after assignments and transfers therefor had been made to her by Stewart. Except for payments made as dividends during the years 1944-1947 under the voting trust certificate for 50 shares (which was retained by Stewart), all payments (as dividends) under the two voting trust certificates representing 700 shares were made to Grace G. Stewart. She received from R & R a check for $1,000 on February 5, 1944; a check for $1,000 on July 21, 1944; a check for $1,000 on February 4, 1945; a check for $1,000 on July 10, 1945; a check for $1,000 on February 5, 1946; a check for $1,000 on July 16, 1946; and, a check for $3,500 on September 2, 1947. The amount, $3,500, represents a payment of $5 per share on 700 shares. R & R made a payment of $3,500 on February 17, 1947, under the two voting trust certificates representing 700 shares but the record does not show who received a check for that amount, or in whose *97 bank account that check was deposited, or what was done with the check. With the exception of the check of R & R dated February 5, 1944, for $1,000, and a check for $3,500 representing the payments by R & R on February 17, 1947, Grace deposited all of the checks noted above which she received from R & R in her separate bank account with the Calumet National Bank of Hammond. Grace endorsed the check of R & R for $1,000, dated February 5, 1944, but it was deposited in a bank account maintained by her husband. In her separate income tax returns for each of the years 1944-1947, inclusive, Grace Stewart reported all of the payments made in each year by R & R as dividends under the voting trust certificate for 200 shares, which she received on January 21, 1944, and under the voting trust certificate for 500 shares, which she received on January 17, 1947. She did not report any other income in her income tax returns for those years. In her returns she took deductions for contributions and sales taxes. The amounts of the above-described payments by R & R which Grace Stewart reported in her income tax returns were as follows: Year
Payments by R & R
1944
$2,000
1945
2,000
1946
2,000
1947
7,000 Stewart *98 did not report in his separate returns for the years 1944-1947 any part of the above amounts. The Commissioner determined that the above-stated amounts are taxable to Stewart under section 22(a) either as additional compensation for his services to R & R, or as dividends, and he included in Stewart's taxable income $2,000 for 1944, $2,000 for 1945, $2,000 for 1946, and $7,000 for 1947. Donald R. Willis Donald R. Willis (also known as Don R. Willis) has been employed in the Chicago office of R & R since at least 1940. During the taxable years he held the position, Supervisor of Copy. He was also an account executive. He became a vice-president of R & R in 1943. During the years here involved he was not a director of R & R. The amounts of salary and bonuses which R & R paid Willis during the years 1940-1948, inclusive, were (in round figures) as follows: Year
Salary
Year
Salary
1940
$10,250
1945
$16,329
1941
12,350
1946
19,999
1942
14,593
1947
23,233
1943
15,215
1948
23,500
1944
14,593
Elna C. Willis (also known as Eleanor) is the wife of Willis. Willis and his wife filed separate income tax returns for each of the years 1944 through 1947. On December 1, 1943, Willis acquired 100 shares of the new common *99 stock of R & R for $500 ( $5 per share), and a common stock certificate was issued to him on December 2, 1943. He assigned a voting trust certificate representing 100 shares to his wife, and either on January 21 or January 31, 1944, she made a transfer to the voting trust trustees and received from them a voting trust certificate representing 100 shares, made out in her name. Elna did not pay anything to her husband as consideration for the assignment of 100 shares to her. Payments were made under the voting trust certificate by R & R of cash dividends to Elna C. Willis during the 4 years 1944-1947, inclusive, in the total amount of $4,000. Willis executed a consent to be bound by the common stock repurchase agreement with R & R on January 10, 1944, and Elna C. Willis executed such consent on January 21, 1944. On February 15, 1945, Willis acquired an additional 50 shares of R & R common stock for $250. On March 20, 1945, Willis assigned and transferred to his wife the 50 shares by assignment of a voting trust certificate, and immediately a new voting trust certificate was issued to Elna, in her name, representing 50 shares, by the voting trust trustees. Elna did not pay anything to *100 her husband for the transfer of 50 shares to her. Payments were made by R & R to Elna under this voting trust certificate of dividends of $5 per share, $250, beginning on July 10, 1945, and biannually during 1946 and 1947. These cash payments totalled $1,250. On December 20, 1946, Willis acquired an additional 50 shares of R & R common stock for $250. On January 17, 1947, he assigned and transferred to his wife, without receipt of any payment from her, a voting trust certificate representing 50 shares, and immediately a new voting trust certificate was issued to her, in her name, by the trustees. R & R made cash payments to Elna during 1947 under this voting trust certificate of $500. To summarize the above: From December 1, 1943, to December 20, 1946, Willis acquired 200 shares of common stock for $1,000, all of which he assigned to his wife. The total amount paid to Elna as dividends under the voting trust certificates was $5,750, which amount was paid as follows: Year
Dividends
1944
$1,000
1945
1,250
1946
1,500
1947
2,000
$5,750
Willis did not report any of the above dividends in his separate income tax returns. Elna reported all of the dividends for each year in her separate tax returns, *101 in which she reported no other income. During the years 1939 through 1950, Willis and his wife maintained a joint bank account with the National Boulevard Bank of Chicago. The account was opened on December 15, 1939, and it was closed on January 22, 1951. Both Willis and his wife had the power to sign checks drawn on this joint account. All of the dividend payment checks of R & R issued to Elna C. Willis during the years 1944 through 1947 were endorsed by both Don R. Willis and Elna C. Willis, and all of the checks were deposited in their joint bank account in the National Boulevard Bank. The Commissioner determined that the above-stated amounts were includible in the taxable income of Donald R. Willis under section 22(a) either as additional compensation for his services to R & R, or as dividends, and he included in the income of Willis $1,000 for 1944, $1,250 for 1945, $1,500 for 1946, and $2,000 for 1947. Royden V. Rice Royden V. Rice has been employed in the Chicago office of R & R as an account executive since at least 1940. He became a vice-president of R & R in 1943. During the years here involved he was not a director of R & R. The amounts of the salary and bonuses paid to *102 Rice by R & R during the years 1940-1948, inclusive, were (in round figures) as follows: Year
Salary
1940
$ 6,625
1941
6,649
1942
8,400
1943
11,765
1944
12,150
1945
13,108
1946
12,499
1947
12,499
1948
12,500
Elsie K. Rice is the wife of Rice. Rice and his wife filed separate income tax returns for each of the years 1944-1947, inclusive. On December 2, 1943, Rice acquired 100 shares of R & R new common stock $500for, and a stock certificate was issued to him in his name, which he assigned and transferred to the voting trust trustees in exchange for a voting trust certificate for 100 shares. Rice executed a consent to be bound by the terms of the R & R common stock repurchase agreement on January 10, 1944. On or about January 21, 1944, Rice assigned and transferred to his wife, without receiving payment of any consideration by her, the voting trust certificate representing 100 shares, and immediately a new voting trust certificate for 100 shares was issued to her, in her name. Elsie executed a consent agreeing to be bound by the R & R common stock repurchase agreement on January 21, 1944. Payments were made by R & R to Elsie under this voting trust certificate of dividends of $5 per share biannually during *103 each of the 4 years 1944-1947, inclusive, and these payments amounted to $1,000 in each year, or $4,000. Rice did not report any of the abovestated dividends in his separate income tax returns. Elsie reported all of the dividends for each year in her separate income tax returns. She reported no other income except that in 1945 and 1946 she reported additional income of $39.50 and $32, respectively. Each dividend check of R & R made payable to Elsie K. Rice was endorsed by both Elsie K. Rice and Royden V. Rice, and each check was deposited in a bank account in the Mercantile National Bank of Chicago. On March 29, 1922, there was a checking account in the Mercantile National Bank of Chicago in the name of Royden V. Rice Advertising Agency which was maintained until September 27, 1946, when the account was closed and the balance in the account was transferred to a new checking account in the names of Royden V. or Elsie K. Rice. The new account, which still is in existence, is a joint account which could be drawn upon under the signature of either Rice or his wife. The dividend checks of R & R made payable to Elsie K. Rice and endorsed by both Royden V. and Elsie K. Rice were deposited *104 in the checking account in the name of Royden V. Rice Advertising Agency during 1944, 1945, and 1946, until that account was closed; and after September 27, 1946, such checks were deposited in the joint bank account. The Commissioner determined that the payments of $1,000 made by R & R to Elsie K. Rice in each of the years 1944-1947, inclusive, were taxable to Rice under section 22(a) either as additional compensation for his services to R & R, or as dividends, and $1,000 has been included in his taxable income for each of the years 1944-1947. Roswell W. Metzger Roswell W. Metzger has been employed in the Chicago office of R & R since at least 1940 as an account executive. He became a vice-president of R & R in 1943 and held that office during the years 1944-1947, inclusive. During the years here involved he was not a director of R & R. The amounts of salary and bonuses which R & R paid Metzger during the years 1940-1948, inclusive, were (in round figures) as follows: Year
Salary
1940
$12,500
1941
14,200
1942
16,613
1943
17,215
1944
17,664
1945
20,094
1946
23,250
1947
26,025
1948
26,874
Adrienne G. Metzger is the wife of Metzger. Metzger and his wife filed separate income tax returns for each of the *105 years 1944-1947, inclusive. On December 1, 1943, Metzger acquired 200 shares of the new common stock of R & R for $1,000 ( $5 per share), and a certificate for 200 shares of common stock was issued to him on December 2, 1943. He assigned and transferred the stock certificate to the voting trust trustees and received a voting trust certificate representing 200 shares. Metzger executed a consent to be bound by the R & R common stock repurchase agreement on January 4, 1944. On January 20, 1944, Metzger assigned and transferred the voting trust certificate for 200 shares, without receiving payment of any consideration for the assignment by her, to his wife. She received a new voting trust certificate from the trustees, in her name, for 200 shares on January 21, 1944. Adrienne G. Metzger executed a consent to be bound by the common stock repurchase agreement on January 21, 1944. Under this voting trust certificate, R & R made payments, as dividends, to Adrienne, in the amount of $5 per share, biannually, during each of the years 1944-1947, inclusive, in the amount of $2,000 in each of the 4 years, or a total amount of $8,000. On February 15, 1945, Metzger acquired an additional 50 shares *106 of R & R common stock for $250. He assigned and transferred the stock certificate to the voting trustees and received in exchange a voting trust certificate for 50 shares. On March 20, 1945, Metzger assigned and transferred this voting trust certificate to his wife without receiving any payment from her for the transfer. She received a new voting trust certificate from the trustees in her name for 50 shares on or about March 20, 1945. R & R made payments, as dividends, under this voting trust certificate to Adrienne on the biannual dividend dates after March 15, 1945, and during 1946 and 1947 in the amount of $5 per share. Under this voting trust certificate Adrienne received $250 on July 10, 1945, and $500 during each of the years 1946 and 1947, or a total amount of $1,250. On December 20, 1946, Metzger acquired an additional 150 shares of common stock for $750. He transferred and assigned the stock certificate to the voting trust trustees and received a voting trust certificate for the same number of shares. On January 17, 1947, Metzger assigned and transferred the voting trust certificate for 150 shares to his wife without receiving payment of any amount for the transfer from her. *107 She received a voting trust certificate, Adrienne received payments from R & R, as dividends, of $5 per share, or $750, on February 17 and September 2, 1947, or $1,500. Under the voting trust certificates representing 400 shares of common stock, Adrienne received payments during the years 1944-1947, inclusive, in the total amount of $10,750, as follows. Year
Dividends
1944
$ 2,000
1945
2,250
1946
2,500
1947
4,000
$10,750 Adrienne reported the above amounts of dividends in her separate income tax returns for each of the years 1944 through 1947. She did not report any other income in her returns. Metzger did not report any of the above amounts of dividends in his separate returns. Each dividend check of R & R was made payable to Adrienne G. Metzger and she endorsed each check, most of the checks being endorsed, "For deposit only." The dividend check dated February 5, 1944, for $1,000, was also endorsed by Roswell W. Metzger for deposit to a bank account in his name. Roswell W. Metzger had an individual bank account in The Northern Trust Company located in Chicago which was opened on April 30, 1931, and was closed on August 1, 1946. Adrienne Metzger did not have power to sign checks drawn on *108 this account. Roswell W. Metzger and Adrienne Grant Metzger have a joint account in the First National Bank and Trust Company of Evanston located in Evanston, Illinois. The account was opened on March 3, 1935, and is still in existence. There were 8 dividend checks of R & R made payable to Adrienne Metzger during the 4 years 1944 through 1947. All of these checks were deposited in the joint account in the First National Bank and Trust Company of Evanston except the first check, dated February 4, 1944, which was deposited in Metzger's account in The Northern Trust Company, and fifth check dated February 5, 1946. The bank stamps on the reverse side of this check do not clearly show in which bank it was deposited. The Commissioner determined that the payments of R & R to Metzger's wife during the taxable years 1944-1947 were taxable to Metzger under section 22(a) as either additional compensation for his services to R & R, or dividends, and he included the amounts of such payments, above set forth, in Metzger's taxable income for each of the taxable years. H. S. Vanderbie During 1947, Harry S. Vanderbie was employed in its Chicago office as an account executive by R & R. He was a vice-president. *109 He was not a director of R & R. R & R paid him a salary and bonus during 1947 of $14,871.80. On June 30, 1947, Vanderbie acquired 150 shares of common stock of R & R for $750, at $5 per share. He executed a consent agreeing to be bound by the terms of the common stock repurchase agreement of R & R. He assigned and transferred all of the shares of common stock to the trustees of the common stock voting trust and received a voting trust certificate representing 150 shares. There are three trusts, one for each of Vanderbie's children, Peter, Susan, and Virginia. William J. Friedman is the trustee of each trust. At some time before September 1, 1947, Vanderbie assigned and transferred 50 shares of R & R common stock, represented by a voting trust certificate, to each of the trusts, 150 shares, and voting trust certificates for 50 shares, each, were issued to William J. Friedman, as the trustee of the Peter Vanderbie Trust, of the Susan Vanderbie Trust, and of the Virginia Ann Vanderbie Trust. No payment of any consideration for the transfers was made to Vanderbie by Friedman, or any other person. Friedman, as the trustee of each trust, executed consents agreeing to be bound by the common *110 stock repurchase agreement of R & R. On September 2, 1947, R & R paid a dividend of $5 per share under the voting trust certificates, and issued three checks for $250, each, to William J. Friedman, as trustee of each of the above-named trusts. The total paid was $750. Each check of R & R bears two endorsements, the first, "Pay to the order of H. S. Vanderbie, (signed) William J. Friedman, trustee," each endorsement being followed by the name of the individual trust; the second, "For deposit only (signed) H. S. Vanderbie." Each check was deposited in the National Boulevard Bank in Chicago. Vanderbie did not report any part of the total payment of $750 made by R & R on September 2, 1947, to Friedman, as trustee Friedman, as trustee, filed a separate fiduciary income tax return for each of the three trusts for the taxable year 1947. In each return, $250 dividends, was reported; no other income was reported. The Commissioner determined that the income of each trust for 1947 was taxable to Vanderbie under section 22(a), and he included in Vanderbie's taxable income for 1947 the amount reported by each trust, a total of $750. Haakon B. Groseth During 1947, Haakon B. Groseth was employed *111 by R & R in its Chicago office as an account executive. He was a vice-president. He was not a director of R & R. R & R paid Groseth a salary and bonus for 1947 in the amount of $18,260.74. On December 30, 1946, Groseth acquired 100 shares of common stock of R & R for $500; he executed a consent agreeing to be bound by the R & R common stock repurchase agreement; and he assigned and transferred his common stock certificate to the trustees of the voting trust, receiving in exchange a voting trust certificate representing 100 shares. On January 17, 1947, Groseth assigned and transferred the certificate representing 100 shares to his wife, Mary R. Groseth, without receiving payment from her of any consideration for the transfer. A voting trust certificate representing 100 shares was forthwith issued to Mary Groseth in her name. She executed a consent agreeing to be bound by the R & R common stock repurchase agreement. R & R made payments under the voting trust certificate, as dividends, of $5 per share, to Mary Groseth on February 17, 1947, in the amount of $500, and on July 24, 1947, in the amount of $500, a total of $1,000. Groseth and his wife filed separate income tax returns for *112 1947. In his return, Groseth did not report any part of the $1,000 paid by R & R to his wife. In her return, Mary Groseth reported $1,000; no other income was reported. Groseth and his wife have maintained a joint checking account in The First National Bank of Hinsdale, located in Hinsdale, Illinois, since April 30, 1945. Mary Groseth has maintained an individual checking account in The First National Bank of Hinsdale since January 15, 1946. The check of R & R for $500, dated February 17, 1947, made payable to Mary R. Groseth, was endorsed as follows: "For Deposit, only 1st Natl. Bank Hinsdale, Ill. (signed) Mary R. Groseth." The check of R & R to her for $500, dated July 24, 1947, was endorsed: "For deposit only to acct of Mr. & Mrs. Haakon B. Groseth 1st Natl Bank-HinsdaleIll. (signed) Mary R. Groseth." The Commissioner determined that the total amount of $1,000 paid to Mary R. Groseth in 1947 was taxable to Groseth under section 22(a) as either additional compensation for his services to R & R, or as dividends, and he included $1,000 in Groseth's income for 1947. Oscar Zahner Oscar Zahner, a resident of St. Louis, Missouri, was employed by R & R in its office in St. Louis as an *113 account executive. He has been employed by R & R since at least 1940. He held the office of vicepresident during the years 1943 through 1947. He was not a director of R & R during any of those years. The salary and bonuses which R & R paid Zahner during each of the years 1940 through 1948 was (in round figures) as follows Year
Salary
1940
$12,500
1941
14,500
1942
16,596
1943
16,900
1944
16,596
1945
16,596
1946
17,415
1947
17,415
1948
17,915 Zahner filed separate income tax returns for each of the years 1944 through 1947. Dorothy C. Zahner was the wife of Zahner. She passed away on April 14, 1954. Dorothy Zahner filed separate income tax returns for each of the years 1944 through 1947. During the years 1943, 1945, and 1946, Zahner acquired, at $5 per share, 200 shares of R & R common stock for $1,000. He acquired 100 shares on December 1, 1943; 50 shares on February 15, 1945; and, 50 shares on December 20, 1946. He executed consents agreeing to be bound by the terms of the R & R common stock repurchase agreement. He assigned and transferred the certificates he received for shares of common stock, in each instance, to the trustees of the common stock voting trust, and received in exchange certificates *114 of the voting trust from the trustee representing equal amounts of common stock. Zahner assigned and transferred the certificates to his wife. On January 31, 1944, he assigned a certificate to her representing 100 shares; on March 20, 1945, he assigned to her a certificate representing 50 shares; and on January 17, 1947, he assigned to her a certificate representing 50 shares. In each instance, Zahner did not receive payment of any consideration from his wife for the transfer. Dorothy Zahner executed consents agreeing to be bound by the terms of the common stock repurchase agreement. She received voting trust certificates representing 100 shares, 50 shares, and 50 shares. R & R made payments to Dorothy C. Zahner under the voting trust certificates, as dividends of $5 per share, on February 5 and July 10, 1944; February 5 and July 21, 1945; February 5 and July 16, 1946; and, February 17 and September 2, 1947. She received from R & R $1,000 in 1944; $1,250 in 1945; $1,500 in 1946; and $2,000 in 1947; all payments being in the total amount of $5,750. Dorothy Zahner reported all of such payments in her individual income tax returns for the years involved, except that she reported only *115 $1,000 in her return for 1945. She reported no other income. Zahner did not report any part of such payments in his income tax returns. Dorothy Zahner maintained an individual checking account in the Mercantile Trust Company (formerly the Mercantile-Commerce Bank and Trust Company) in St. Louis. The account was not a joint account with her husband. The account was opened on February 11, 1944; it was closed on April 30, 1954. Dorothy Zahner deposited all of the payments she received from R & R during the years 1944-1947, inclusive, in her individual bank account. The total amounts of the deposits and withdrawals in the individual checking account of Dorothy Zahner, and the amounts of the year-end balances in each of the years 1944-1947, inclusive, were as follows: 1944, deposits $1,031.86, withdrawals $940.37, balance as of end of 1944 $91.49; 1945, deposits $1,260, withdrawals $999.95, balance as of end of 1945 $351.54; 1946, deposits $1,500, withdrawals $1,738.76, balance as of end of 1946 $112.78; 1947, deposits $2,100.07, withdrawals $2,205.57, balance as of end of 1947 $7.28. (The amounts set forth above as the year-end balances in the bank account reflect correction of a consistent *116 error of 80 cents throughout Exhibit 143.) The Commissioner determined that all of the payments of R & R which were received by Dorothy C. Zahner during the years 1944 through 1947 were taxable to Zahner under section 22(a) as either additional compensation for his services to R & R, or dividends, and he included in Zahner's taxable income for 1944, $1,000; for 1945, $1,250; for 1946, $1,500; and, for 1947, $2,000. Summary: Total Amounts of Payments Involved A schedule set forth above shows the total number of shares of the new common stock of R & R which were issued during the years 1943 through 1947 to the petitioners, namely, 5,250 shares, for which the total sum of $26,250 was paid. The schedule below summarizes by year and for the 4 years, 1944, through 1947, the total amounts of the payments made by R & R, as dividends, under the voting trust certificates. The total amount of such payments to all of the petitioners was $142,500. Of that total amount, the petitioners, collectively, reported in their respective, separate income tax returns $5,000, and their respective transferees and assignees, collectively, reported $137,500. Under the separate and respective determinations of *117 the respondent, $137,500 has been added to the taxable income of the petitioners. The following schedule tabulates by years the payments of R & R, as annual dividends, which are attributable to all of the shares of common stock which, in the first instance, were issued to each petitioner, or in a few instances, to a member of the family of a petitioner: Payments by R & R as Common Stock Dividends
Petitioner
1944
1945
1946
1947
Total
Watson [1]
$16,000
$16,000
$16,000
$16,000
$ 64,000
Littell
4,500
4,750
5,000
10,500
24,750
Emery
1,000
1,250
1,500
3,000
6,750
[2]Ketting None
250
500
4,000
4,750
[3] *118 Stewart 2,000
2,250
2,500
7,500
14,250
Willis
1,000
1,250
1,500
2,000
5,750
Rice
1,000
1,000
1,000
1,000
4,000
Metzger
2,000
2,250
2,500
4,000
10,750
Vanderbie
None
None
None
750
750
Groseth
None
None
None
1,000
1,000
Zahner
1,000
1,250
1,500
2,000
5,750
$28,500
$30,250
$32,000
$51,750
$142,500
The following schedules show in summary the amounts of the payments which the respondent has determined are taxable to each petitioner under section 22(a) as compensation for services or dividends: Paul E. Watson
Paid to
Paid to
Paid to
Year
Wife
Son
Daughter
Total
1944
$10,000
$1,500
$1,500
$13,000
1945
10,000
1,500
1,500
13,000
1946
10,000
1,500
1,500
13,000
1947
10,000
1,500
1,500
13,000
William P. Littell
1944
None
$4,500
None
$ 4,500
1945
$ 1,750
3,000
None
4,750
1946
3,500
1,500
None
5,000
1947
3,500
1,500
$5,500
10,500
Carlyle Emery
Paid to
Year
Wife
1944
$1,000
1945
1,250
1946
1,500
1947
3,000
Kenneth D. Stewart
1944
$2,000
1945
2,000
1946
2,000
1947
7,000
Royden V. Rice
1944
$1,000
1945
1,000
1946
1,000
1947
1,000
Howard B. Ketting
1947
$4,000
Donald R. Willis
1944
$1,000
1945
1,250
1946
1,500
1947
2,000
Roswell W. Metzger
1944
$2,000
1945
2,250
1946
2,500
1947
4,000
H. S. Vanderbie
Paid to
Paid to
Trust
Paid to
Trust for
for
Trust for
Year
Son
Susan
Virginia
Total
1947
$250 $250 $250 $750
Haakon B. Groseth
Paid to
Year
Wife
1947
$1,000
Oscar Zahner
1944
$1,000
1945
1,250
1946
1,500
1947
2,000
Ultimate *119 Findings of Fact Paul E. Watson: Nelle G. Watson bought 1,000 shares of common stock from Watson with her own funds. She acquired complete control and ownership of the shares. The dividends paid on the shares were hers. Watson did not retain any interest in, or control over, the shares or the dividends. Watson made separate gifts to his daughter and his son of 150 shares, each. The gifts were valid and complete, and Watson did not retain any interest in or control over either the shares or the dividends paid thereon. William P. Littell: Sarah E. Littell bought 450 shares from Littell with her own funds. She acquired complete ownership and control of the shares, and Littell did not retain any interest in or control over the shares, or the dividends. In a valid and bona fide transaction between Sarah and Anne Littell, Sarah transferred 300 shares to Anne in 1945; thereafter, Anne owned and controlled those shares; and Littell did not have any interest in or control over those shares, or the dividends paid on them. Littell made a valid and complete gift of 50 shares to his wife in 1945 and, thereafter, he had no interest in or control over those shares or their dividends. Anne bought *120 550 shares from Littell in 1947 with her own funds. The transaction was a valid sale through which Littell was divested of all interest in and control over the shares and their dividends in which Anne acquired the entire interest. Anne was the grantor in January 1947 of The Anne Fithian Trust for the benefit of her adult daughter and her minor son. Littell was not indirectly the grantor of the trust. He was the trustee only. None of the trust income was used to discharge any legal obligations of Littell. He received no economic benefit from the trust and was not a beneficiary. Anne made a valid and bona fide transfer to the trust of 550 shares. Carlyle Emery: Eve Emery bought 250 shares with her own funds. She received a gift of 50 shares from Emery. She acquired the entire ownership of and interest in the 300 shares and their dividends; Emery did not retain any interest in or control over these shares or their dividends. Howard B. Ketting: Ketting did not make a present and complete gift of 400 shares to his wife. He has failed to prove that he did not retain an interest in and control over the shares and their dividends. Kenneth D. Stewart: Stewart did not make a present and complete *121 gift of 200 shares to his wife in 1944, and he did not make a bona fide sale of 500 shares to her in January 1947. He did not relinquish all interest in and control over the 700 shares and their dividends. Donald R. Willis, Royden Rice, Roswell Metzger, Haakon Groseth, Oscar Zahner: All of these petitioners retained an interest in and control over the shares of common stock and the dividends paid thereon, respectively, which each purportedly gave to his wife. None of these petitioners made present, complete, and bona fide gifts of stock to his wife. H. S. Vanderbie: For failure of proof, the income of the 3 trusts, consisting of diidends on R & R stock transferred to the trusts, is taxable to the petitioner. As of October 15, 1943, the R & R corporation was controlled by Frederick B. Ryan, Elizabeth C. Ryan, Frederick B. Ryan, Jr., Quincy and Bruce Ryan, and members of the Ruthrauff family, of which group Ryan, and his son, and F. Bourne Ruthrauff were members of the board of 10 directors. None of the petitioners and no group of the petitioners controlled the corporation or had a deciding voice in determining its policies. Only Watson and Littell were on the board of directors. None *122 of the petitioners is related to any member of the Ryan and Ruthrauff families. None of the petitioners and no group of the petitioners determined that stock in R & R could be sold to employees, including themselves. The issuance of preferred stock to the estate and surviving members of the family of Wilbur B. Ruthrauff, deceased, and to Frederick B. Ryan, who died after 1948, and members of his family, and the adoption of the policy to offer common stock for sale to key executive-employees was due to the combination of such facts as the death of Ruthrauff, the imminent retirement of Ryan, the demand of key employees for common stock for themselves and their families, and the need for extending the ownership of the corporation beyond the group of the Ruthrauff and Ryan families to include key employees on whom would depend the future management and development of the corporation's business. These steps had a business purpose. The adoption of a temporary voting trust was an ordinary and bona fide arrangement during a transition period for the purpose of continuity of management. The corporation's right to repurchase common stock, which subsequently was modified, was for the purpose *123 of restricting the ownership of the corporation to those who actively participated in the management and direction of the business and to keep the stock from being sold to outsiders. The new common stock was validly issued bona fide stock; it represented an interest in the corporation's assets. The sales of the common stock by the original owners and the corporation were bona fide transactions through which the purchasers made investments. It was the intention of the parties that the purchasers would acquire proprietary interests in the corporation; it was not their intent to provide additional compensation. The employees' stock ownership plan of R & R was a legitimate plan having a business purpose, and was intended to benefit the corporation. It was not a device for paying additional compensation in the guise of dividends or helping employees to avoid tax. The regular salaries paid to the petitioners in the taxable years fully and adequately compensated them for their services. The common stock was not sold to the petitioners or other employees to obtain better or increased services, or to provide additional compensation. The selling price was not made dependent upon the service *124 of any employee; employees' duties were not increased and salaries were not reduced. There was no correlation of the sales of stock or dividends to the regular salaries of the employees who bought stock. The dividends were paid pro rata to all stockholders and were the shares of earnings attributed to their ownership of stock. The dividends involved here were dividends and were not additional compensation. The dividends declared during the taxable years did not represent a scheme to pay the petitioners and other employees compensation in the guise of dividends. The stipulated facts are found as stipulated. Opinion Issue 1 The issue to be decided in all of these cases is whether all of the disputed dividends paid on the new common stock of the R & R corporation is taxable to each petitioner rather than to his wife or other members of his family, or to a trust or trusts. Except in the case of Paul E. Watson, this issue need be considered only on the basis of whether each petitioner has met his burden of proving that he made a bona fide and complete transfer of shares of stock and did not retain, directly or indirectly, control over the shares or the dividends paid thereon, so as not *125 to be liable for tax on the dividends, under section 22(a), 1939 Code, within the reasoning of Corliss v. Bowers, 281 U.S. 376, 378; Burnet v. Wells, 289 U.S. 670; Douglas v. Willcuts, 296 U.S. 1; and Helvering v. Clifford, 309 U.S. 331. In this posture of the issue, it is assumed that the new common stock was what it purported to be; that valid purchases of shares were made by the petitioners, or in some instances by members of their families; and that the dividends in question were that and not payments to each of the petitioners of additional compensation for services, therefore earned income, in the guise of distributions of dividends. We consider first whether any amount of the dividends, as dividends, is taxable to any of the petitioners under the doctrine of the above-cited cases. [4]
The transfer of income-producing property is ineffective to shift the incidence of the tax on the income from the transferor to the transferee where the power remains in the transferor to appropriate or control the receipt of or the enjoyment of *126 the income. The Clifford case made it clear that "where the parties to a transfer are members of the same family group special scrutiny is necessary." "The crucial question remains whether the assignor retains sufficient power and control over the assigned property or over the receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes." Commissioner v. Sunnen, 333 U.S. 591, 604. It is the command over the income and the actual enjoyment of the economic benefits derived from the income which provide a critical test of whether income remains taxable to the transferor of property. Commissioner v. Tower, 327 U.S. 280; Harrison v. Schaffner, 312 U.S. 579, 581, 582; Helvering v. Clifford, supra; Corliss v. Bowers, supra; and Helvering v. Horst, 311 U.S. 112. Cf. Blair v. Commissioner, 300 U.S. 5. Applying here the tests provided by the cited authorities, we are unable to conclude that in the cases of Ketting, Stewart, Willis, Rice, Metzger, Vanderbie, Groseth, and Zahner the dividends in question are not taxable to each of them. In each instance there is a failure of proof. None of these petitioners testified. Each was content to rely *127 upon some stipulated facts and documentary evidence, none of which establishes that control over and enjoyment of the economic benefits of the dividends did not remain in him. The Findings of Fact contain our ultimate finding in each case. Briefly, the failure of each of the above taxpayers in meeting his burden of proof may be indicated as follows: In Ketting's case only 1947 is involved. Although he allegedly gave his wife 400 shares, he received one-half of the dividends, $2,000, which his wife endorsed over to him and he deposited in his own bank account. Even though Prudence deposited the other half, $2,000, in her separate bank account, there is no proof from which it can be found that such amount was not used to pay for household or other expenses which were Ketting's obligation, or to provide for his benefit in some other way. It was Ketting's burden to prove that he did not retain any dominion and control over 400 shares. If he had control over or received the economic benefit or enjoyment of all of the dividends there would be a strong inference that he did not make a bona fide gift of the shares to his wife. The failure of Ketting and his wife to testify gives rise to the *128 presumption, under the circumstances, that their testimony would have been unfavorable to them. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165, affd. 162 F. 2d 513. The same rule applies in the cases of Stewart, Willis, Rice, Metzger, Vanderbie, Groseth, and Zahner. Stewart allegedly gave his wife 200 shares and she purportedly purchased 500 on January 17, 1947, although the checks drawn on her account for such purchase were not issued until February 25 and September 29, 1947. The total amount of the dividends on the 700 shares is $13,000. Stewart admits that he received dividends of $1,000 in February 1944; and there is no evidence to show who received or what use was made of dividends of $3,500 paid on 700 shares in February 1947. Thus, $4,500 of dividends are not shown to have been enjoyed and used by Grace for her own benefit, within her complete control. Grace received and deposited in her own bank account, the remaining dividends of $8,500, but there is no proof that such amount nevertheless was not used to pay for household and other expenses which were Stewart's obligation, or to provide for his benefit in some other respect. Stewart has failed to prove that he did not *129 have dominion and control over the 700 shares and all of the dividends paid; he has not overcome the prima facie correctness of the respondent's determination. Willis and his wife, Rice and his wife, Metzger and his wife, Groseth and his wife had joint bank accounts. In each case, all or some of the checks for dividends were deposited in a joint bank account; or in some instances a check was deposited in the husband's separate bank account. In some instances, dividend checks were endorsed by both the husband and wife. Zahner's wife had a separate bank account in which she deposited all of the dividend checks. In the instances where the taxpayers and their wives had joint accounts in which dividends were deposited, the husbands had control over them and could use them for their own benefit; and that was true, of course, where dividends were deposited in a husband's separate bank account. In all of these cases, each petitioner has not proved that the dividends in question were not used to pay for household or other expenses which were each petitioner's obligation, or were not used for the benefit of each petitioner, and that all of the dividends were enjoyed and used by each wife, respectively, *130 and were within her complete control. This applies in Zahner's case, as well. Furthermore, none of these petitioners has proved that he did not retain dominion and control over the shares represented by the voting trust certificates, as well as over all the dividends, and, therefore, none has proved that he made bona fide gifts to his wife. None has overcome the prima facie correctness of the respondent's determination. In Vanderbie's case, the year 1947, only, is involved, and dividends for 6 months in the amount of $750 paid on 150 shares. He had created a trust for each of his 3 children on March 5, 1943, and in 1947 he assigned 50 shares to each trust, to which $250 dividends were paid. William J. Friedman was the trustee of each trust. It is not clear from the stipulation of facts whether Vanderbie was a cotrustee. Vanderbie did not introduce into evidence the trust indentures. He did not testify. We do not know whether the trusts are revocable or not. The record is silent with respect to all of the provisions of the trusts. In the fiduciary return filed for each trust, the trustee reported that none of the trust income was distributable. The record does not show the ages of *131 the beneficiaries of the trusts in 1947, but in his income tax return Vanderbie claimed an exemption for each child. We may not assume that the provisions of each trust are such that the trust income is not taxable to Vanderbie under the rule of the Clifford case and related cases, or that under regulations of the Commissioner relating to trusts created before 1946, the trust income is not taxable to Vanderbie. See Regulations 111, section 29.22(a) 21, and Treasury Decision 5488, 1946-1 C.B. 19. Vanderbie has failed to prove that he did not retain a control over each trust so complete that he was in practical effect the owner of the trust income, or that the trusts would not terminate in 10 years, or less, at which time the trust corpora would revert to himself. If it is true that Vanderbie was not a cotrustee of each trust, that factor alone will not forestall taxing trust income to a grantor. See Regulations 111, supra; Kay v. Commissioner, 178 2d 772, affirming 11 T.C. 471; Jergens v. Commissioner, 136 F. 2d 497, affirming a Memorandum Opinion of this Court, certiorari denied 333 U.S. 735; and Whiteley, Jr. v. Commissioner, 120 F. 2d 782, affirming 42 B.T.A. 402, certiorari *132 denied 314 U.S. 657. Vanderbie has failed to overcome the prima facie correctness of the respondent's determination, which has been made under section 22(a). He has not proved facts which would take the trusts out of the rule of Clifford and bring them under the rule of Blair v. Commissioner, supra. Upon the record, we are unable to determine whether Morris Cohen, 15 T.C. 261, cited by petitioner, applies here; it (p. 275) does not apply under the record here. The cases of all of the above petitioners involve intrafamily gifts and transactions. The transfer of stock in itself is not sufficient to prove a gift. Theo. C. Jackson, 32 B.T.A. 470. Absence of consideration, alone, does not evidence a gift. Willis L. Garey, 16 B.T.A. 274. The essentials of a bona fide gift include the irrevocable transfer of the present legal title and of the dominion and control of the entire subject matter of the gift to the transferee, so that the donor cannot exercise any further act of dominion and control over the property or its income. Adolph Weil, 31 B.T.A. 899, 906, affd., 82 F. 2d 561, certiorari denied 299 U.S. 552. It has been held that where allegedly there was a gift of stock to the *133 wife, but the stock and the dividends remained available for the use of the husband, and the wife used part of the dividends to pay expenses of the family previously paid by the husband, the dividends for Federal tax purposes should be treated as the income of the husband-transferor. Sewell v. United States, 73 F. Supp. 957. Where a donor can use the income of the property to his own advantage, or to discharge his own obligations, he is not relieved of tax on the income. Harrison v. Schaffner, supra; Helvering v. Fitch, 309 U.S. 149; Jergens v. Commissioner, supra, p. 498; Helvering v. Stuart, 317 U.S. 154 (relating to the R. Douglas Stuart trust); and Anderson v. Commissioner, 164 F. 2d 870, affirming 5 T.C. 443. "Command over the property or its enjoyment marks the real owner for federal income tax purposes. * * * the mere passage of title to income-producing property will not insulate the transferor against federal income tax liability unless the passage of title is accompanied by a complete shift of the economic benefits of ownership, direct and indirect." Anderson v. Commissioner, supra, p. 873. The command over the disposition of the income of transferred property determines *134 the incidence of the tax on such income, whether the taxpayer exercising such control takes it for himself or not. Jergens v. Commissioner, supra.The above-named petitioners have failed to show by competent proof that their intrafamily transactions were carried out in such way that the dividends in question are not taxable to them under section 22(a), and that, rather, the rule of the Blair case applies. In this respect, it is noted that in the Blair case the Supreme Court pointed out (p. 333) that there was no question of the taxpayer's retention of control of the transferred property. In the above-named 8 cases, the respondent's determinations are sustained. In the case of Littell and Emery, however, the opposite conclusion is reached. Each petitioner introduced competent proof that the dividends in question are not taxable to him. The evidence establishes that Littell's sister and wife, and Emery's wife purchased shares of stock; that Littell and Emery made gifts of some shares to their wives; and that Littell's wife created a trust to which she made valid transfers of stock. Whether the sales and gifts of Littell and Emery and the purchases by their wives were bona fide and *135 complete so as to render the dividends taxable to the owners of record of the stock, and whether the income of the trust created by Anne Littell is taxable to Littell involve questions of fact. Our findings dispose of them in favor of these petitioners. All of the evidence presented by Littell and Emery, including their testimony and the Anne F. Littell trust indenture, in our opinion proves that neither Littell nor Emery retained economic benefits from or control over the shares of stock or the dividends. Each case involving such questions depends upon its particular facts. See, for example, Apt v. Birmingham, 89 F. Supp. 361. We think that valid gifts were made within the rule expressed in Adolph Weil, supra, and that bona fide sales were made which divested these petitioners of all of the elements of ownership of the stock involved. It is held that the dividends are, therefore, taxable to the owners of record of the shares, and that they are not taxable to Littell and Emery. Issue 2 The second issue is in general whether the common stock sold by the original owners and later by the corporation represented proprietary interests in the corporation and correlatively the dividends *136 represented the stockholders' shares of annual earnings, or whether the transactions and the common stock were not what they were purported to be and the dividends were additional compensation. If the dividends were compensatory, as the respondent contends, they are taxable to those who rendered the services for which requital was made rather than to those who subsequently became the owners of the shares and were the owners when the dividends were paid. Lucas v. Earl, 281 U.S. 111. This is now the only issue in the Watson case. [5] It is the remaining issue in the Emery and Littell cases because of our conclusions under the first issue. The respondent agrees that there is *137 no issue in these cases with respect to the receipt of the common stock as compensation. Cf. Estate of Edward J. Connolly, 45 B.T.A. 374; Commissioner v. Smith, 324 U.S. 177; Abraham Rosenberg, 20 T.C. 5. He has not determined and he does not contend that when the stock was purchased taxable income was then realized because the per share value of the stock was greater than the selling price. He does not take any definite and clear position on this point, and it is not in issue. Respondent does not insist that the record establishes that the selling price of the common stock was not approximately its value. This is not a stock option case. The respondent's contention that the distributions were compensation in the guise of dividends is founded primarily upon the theory that the 1943 reorganization or recapitalization of the corporation, wherein a stock dividend of preferred stock was distributed and some common stock was sold to 16 employees and to the corporation, was under all of the circumstances a scheme to increase the compensation, of certain executives of the corporation. It is from that premise that he ultimately argues that the dividends were compensatory. Respondent cites *138 no case with similar facts, and he relies chiefly upon Carlton B. Overton, 6 T.C. 304, affd. 162 F. 2d 155 (where the taxpayers controlled their corporation); and Joseph Kane, 25 T.C. 1112, affd. 238 F. 2d 624 (a stock option case involving a different issue). The determination of the taxable nature of monies paid, whether gifts, dividends, or compensation depends largely upon the real intent of the parties, particularly the payor, as disclosed by the particular facts and circumstances surrounding the questioned payments. Bogardus v. Commissioner, 302 U.S. 34, 45; Neville v. Brodrick, 235 F. 2d 263, 265-266, reversing 133 F. Supp. 716; Patent Button Co. v. Commissioner, 203 F. 2d 479, 481; Abraham Rosenberg, supra, p. 9. Although the ultimate question for decision is whether the dividends were compensatory, the way in which the issue is presented does not permit considering the dividend payments as separate and apart from the sales of stock to executive-employees of the corporation. Rather, the several arrangements which took place during the last 3 months of 1943, and all of the facts and circumstances, must be taken into account. If the shares of common stock were sold *139 for the purpose of providing the vendees with proprietary interests in the corporation, the dividends were an incident of ownership of the stock, were attributable to such proprietary interests, and were the earnings of investments. Blair v. Commissioner, 300 U.S. 5, 12; Commissioner v. Straus, 208 F. 2d 325, 328, affirming a Memorandum Opinion of this Court; Rossheim v. Commissioner, 92 F. 2d 247; Abraham Rosenberg, supra.If the transfers of the stock were intended to effectuate payments by the corporation in the future of additional compensation for services rendered by executive-employees in the guise of dividends, the distributions must be regarded as compensatory. United States Steel Corporation, 2 T.C. 430; Chrysler Corporation, 42 B.T.A. 795, 807. The entire record, all of the circumstances, and the contentions of the parties have been carefully considered. It is concluded that the common stock was bona fide stock and that the sales of common stock by the members of the two families and the estate and the subsequent sales of stock by the corporation were not a sham and were not a colorable scheme to pay executives additional compensation in a manner which would enable *140 them to escape tax. The sales to the employees were bona fide; it was intended that they would acquire proprietary interests in the corporation; the dividends were not intended to be additional compensation and there was not a casual connection between the dividends paid and the corporation's determination of the complete compensation of the employees, including the petitioners. The death of Ruthrauff in 1941 and Ryan's imminent retirement required consideration of the future management of the corporation. The Ruthrauff estate owned one-third of the only outstanding stock. There were four separate and distinct interests to be considered. The Ruthrauff estate had a large investment in the corporation; the Ryan family had an equally substantial interest; the corporation, with 650 employees, had a nationwide business; and executive-employees, several of whom had been associted for many years, regarded Ruthrauff's death as presenting the opportunity for realizing a long-standing desire to acquire stock for themselves and their families. No changes in stockholdings occurred for over 2 1/2 years after Ruthrauff's death. For some time prior to 1943, key employees had strongly expressed to *141 Ryan their desires to acquire stock and they had exerted considerable pressure, particularly those in the Chicago office. The corporation's problem was real and it also was a complicated one, the solution of which was found in a recapitalization in which the authorized stock was increased. However, its purpose was not intended to obtain new capital. The required capital initially had been put into the corporation by the Ruthrauffs and the Ryans. The first step taken to satisfy the concerns of the several interested groups was the issuance of preferred stock to the members of the two families, the sole stockholders. The purpose of that step was to provide a means which would enable the two families to maintain their investments in the corporation, to prepare for their withdrawing into the position of investors and of making the transition of gradually turning over the active management of the corporation to key employees, and to lay a foundation for issuing common stock to the latter. The next step was for the estate and the members of the two families to sell common stock to employees and the corporation. The third step, taken by the corporation, was to adopt an employees' stock ownership *142 plan and to provide for continuity of management during a period of transition. The purpose of the voting trust was to maintain continuity of management during a period at the end of which control would pass to the holders of the common stock. The plan to issue common stock to employees included the objective of keeping the common stock in the hands of active employees, which was the purpose of the repurchase agreement, a widely used arrangement where the success of a business depends upon the abilities and skills of the employees and the corporation is closely held. All of these steps had a real business purpose and they were properly taken in accordance with legal requirements. Upon their sales of common stock to employees and the corporation in 1943, the Ruthrauffs and Ryans were committed to the plan. During the transition period, Ryan gradually reduced his participation and eventually retired. His salary was reduced from $100,000, which he received in 1943, to $27,500 in 1948 Ryan died at some time after 1948, before the trial of these cases. It was found that a shorter period than 10 years was all that was necessary for the transition in management and the voting trust was terminated *143 in about 5 years, on March 30, 1949, when the common stock was released from the trust. Another phase of the transition involved the corporation's repurchase agreement. It was amended several times as experience in the operation of the continuing employees' stock ownership plan indicated. Originally the agreement provided that should the corporation purchase common stock from an employee or his transferee, it would pay $5 per share. That was the price at which the Ruthrauffs and Ryans were prepared to and did sell some of their common stock in 1943. They did not act under any compulsion when they sold the stock and upon the entire record it is evident that they regarded this to be a fair price for the stock at the time, following the issuance of the prior preferred stock. The corporation had paid that price for shares which it purchased from them in 1943. We think it was reasonable that initially, the repurchase price stated in the repurchase agreement should have been set at this figure. However, later, after 1947, it became evidence that the original repurchase price was not reasonable (apparently because the equity value of the common stock increased), and the repurchase agreement *144 was amended to make the repurchase price the book value of the common stock as of the time of any repurchase, but not less than $5 per share. Since then, the corporation has paid as much as $50 and $60 per share. The employees' stock ownership plan was not artificial. It has been continuously maintained. At its inception in December 1943, the Ruthrauffs and Ryans sold 9,400 shares to 16 executive-employees (including 8 of the petitioners here), of whom 7 were in the New York office, 8 were in the Chicago office, and 1 was in St. Louis. Thereafter, the corporation sold shares to employees out of stock held in its treasury, which it purchased from the Ruthrauffs and Ryans. The corporation purchased 2,400 shares from them in 1943, and in 1944 it purchased an additional 300 shares from Bruce E. Ryan. By the end of 1947, the number of employees to whom common stock had been sold had increased as well as the number of shares sold to them. Groseth, Ketting, and Vanderbie purchased stock in 1945, 1946, and 1947. The Ryans and Ruthrauffs retained some of their common stock. They continued to own 3,200 shares at the end of 1943, and 2,900 shares at the end of 1944. Thus, 12,100 shares were made *145 available under the employees' stock purchase plan. With respect to the petitioners, the respondent argues that the stock purchase plan was a tax avoidance scheme. However, it is noted that the total number of shares of common stock involved in these cases, as of the end of 1947 is only 5,250 shares. Other employees purchased close to 6,850 shares by the end of 1947. The plan obviously was not confined to the petitioners in these cases. The employees' stock purchase plan, of which the temporary voting trust and the repurchase agreement were part, was similar to other employees' stock purchase plans as is shown by numerous cases. See, for example, Batten, Barton, Durstine & Osborn, Inc., 9 T.C. 448, reversed on another question 171 F. 2d 474; R. J. Reynolds Tobacco Company v. United States, 149 F. Supp. 889; Anderson, Clayton & Co. v. United States, 122 F. Supp. 837, affd. 350 U.S. 55; and other cases cited in the margin. [6] *148 In Batten, Barton, Durstine & Osborn, the corporation (engaged in the advertising business) had an employees' stock purchase plan under which, by written agreement, the stockholders were obliged to offer their stock to the corporation or repurchase in the event *146 of termination of employment, and the stock was subject to a voting trust agreement. In Anderson, Clayton the corporation's cotton merchandising business had been organized in 1929 by W. L. Clayton and M. D. Anderson who owned most of the common stock which was no par stock with a stated value of $1 per share. The business depended upon the experience and skill of the chief executives and for that reason a stock purchase plan for key executives was adopted in 1930 when shares of common stock were sold to them for $1 per share. All of the common stock was endorsed over to a trustee. There was a written agreement which provided for the repurchase of the common stock by the corporation or other company officials at a special book value, but in no event, less than $1 per share. The corporation was obligated to purchase the stock of any common stockholder who left the company. "The common stock was trusteed under conditions that assured its receipt and retention by only the active management and its redistribution according to changing managerial responsibility." In R. J. Reynolds Tobacco Co., there was a plan to have employees purchase stock so as "to acquire a proprietary interest in *147 the company and thereby acquire voting control" (p. 891). See, also, Commissioner v. Straus, supra.In these cases the courts have rejected the Commissioner's contentions that sales of stock to employees were not intended to provide proprietary interests in employer corporations, and they have also overruled the determination that distributions of dividends on stock were compensation. Each case stands on its own facts, of course, but it must be recognized that the Commissioner has so frequently determined that dividend payments were disguised compensation, under similar plans, that it is evident that the issue here at least is not unique. Respondent questions the petitioners' position that common stock was equity stock and represented proprietary interests. In this connection he refers to the prior claim upon the corporation's assets of the 15,000 shares of prior preferred cumulative stock redeemable at $100 per share. We are unable to find that the common stock was devoid of the legal characteristics of equity stock, or that it did not carry the rights of such stock. It could be transferred; it carried the rights to vote, to participate in the distribution of earnings, and to share in the appreciation in the net value of assets after the preferred stock. See Elko Lamoille Power Co. v. Commissioner, 50 F. 2d 595, for a summary of the distinctions between common and preferred stock. As noted above, the repurchase price eventually was fixed at book value. The equity of the preferred stock was limited to $100 per share and preferred stock could be redeemed and eliminated in such amount as the corporation might determine in any year on any dividend date. The voting trust was temporary and of short duration. When it ended control of the corporation passed to the common stockholders and they would be in the position *149 of eliminating the preferred stockholders gradually and even entirely by redeeming their stock. As long as a stockholder owned common stock, he had a right in assets upon a corporate liquidation or reorganization. The fact that there was prior preferred stock redeemable at $100 per share did not destroy the interest of the common stock, as stock, in net assets; it only served to diminish such interest. The right of a corporation to repurchase stock is not incompatible with the rights reposed by law in common stock. Respondent does not refer to any rule which has the effect of denying recognition of the ordinary rights in common stock, for tax purposes, where the stock is subject to a repurchase agreement, or which does not recognize valid transfers of such stock in taxing its dividends. See Bank of California National Association, 30 B.T.A. 556, 561, where it was held that a repurchase plan was not a tax avoidance device; and James H. Torrens, 31 B.T.A. 787, 794. Respondent's view is inconsistent in that it does not regard the common stock sold to employees as standing on the same basis as the common stock retained by the Ryans and Ruthrauffs. The Ryans retained in 1943 22.2 per *150 cent, and a son of Ruthrauff retained 3.2 per cent, a total of 25.4 per cent. Respondent also questions the reality and validity of the common stock because it was sold by the Ryans and Ruthrauffs for $5 per share. The corporation later sold such stock also for $5 per share. That was because that price had been fixed by the original stockholders and the corporation gave all employees equal treatment. The Ruthrauffs and Ryans, the sole stockholders, had decided to gradually withdraw from active participation and to take the position of investors through preferred stock. The petitioners and other employees had nothing to do with the decisions of the then sole stockholders. Also, the original stockholders had decided to gradually transfer the responsibilities of management to key executive-employees. They could have made gifts of stock to such employees but it would not have followed, for tax purposes, that common stock dividends constituted compensation. See Neville v. Brodrick, supra.They elected to sell some of their common stock to employees. To do this, they, as the controlling stockholders, also elected to create two classes of stock. The issuance of preferred stock had the effect *151 of reducing the common stock to a lower value and to a value at which the employees could make outright purchases. The Ryans and Ruthrauffs were not acting under any compulsion when they sold some of their common stock in 1943. They considered $5 per share to be a fair price to them at that time; they fixed the price. It appears to have been a reasonable price. The petitioners and the other employees had no voice in that decision other than that they were willing to pay it. The Ruthrauffs and Ryans decided how much stock they would sell, and the employees had nothing to do with that determination. Watson negotiated directly with Abbie H. B. Ruthrauff in making his purchase of stock. The petitioners and the other purchasers paid a not unsubstantial amount for the stock. However, each became a minority stockholder. Consideration of all of the evidence leads us to conclude that the common stock purchased by the petitioners, other employees, and other individuals was in reality common stock representing proprietary interests. There were bona fide sales and purchases; a substantial amount was fully paid. The transfers of the stock on the corporation's books, the provisions in the repurchase *152 agreement that the stock might be "repurchased" by the corporation, and the payment of dividends, all confirm an intended sale of the stock. The Ruthrauff estate, Abbie H. B. Ruthrauff, Florence Ruthrauff, and Frederick B. Ryan, sold all of their common stock in December 1943. They did not reserve any right to repurchase the common stock. Their step was irrevocable. They gave up the right to participate in the future growth of the corporation's business. Those who purchased the common stock acquired more than merely a right to future earnings. They acquired the right, inherent alone in holders of common stock, to share in any increment in the net assets of the corporation after the share attributable to the preferred stock. They acquired the voting rights. The evidence shows that the Ryans and Ruthrauffs intended to convey proprietary interests when they sold the stock. The sales of the stock were not a fiction. Respondent takes exception to the fact that the petitioners transferred stock to nonemployees of the corporation (with the exception of Watson's son who is an employee). As owners, they had a legal right to do so. "The legal right of a taxpayer to decrease the amount of what *153 otherwise would be his taxes, * * *, by means which the law permits, cannot be doubted. United States v. Isham, 17 Wall. 496, 506 [84 U.S. 728]. * * *." Gregory v. Helvering, 293 U.S. 465. The record shows that Paul E. Watson retained and still owns 300 shares, Stewart retained and still owns 50 shares, Ketting did not transfer any of his stock until 1947. Frederick B. Ryan, Jr., F. Bourne Ruthrauff, Quincy G. Ryan, Van Buren, and William D. Watson received and still own stock in their own names. No single employee could control what the other employees might do. Whether an intrafamily transfer is valid is a separate question. See Issue 1. It is observed that before common stock was sold to employees, it had been held by members of the Ryan and Ruthrauff familes. The employees who transferred stock to members of their families followed the same practice. But that did not make the stock any the less valid stock. The respondent, incongruously, does not question the validity and substance of the common stock retained by the Ryans (because they held common stock before the recapitalization). His view is that the common stock which they retained is valid stock, but the shares which *154 were sold were a sham. The evidence does not support that view. The common stock which was sold was duly authorized and issued stock of the corporation; it was not a sham. The employees' stock ownership plan was real; it was not a sham. We cannot find that the plan was designed for tax avoidance. There remains for consideration the question whether the dividends paid on the common stock were compensation rather than true dividends. Consideration must be given to whether the sellers of the stock intended that it would serve as a means for paying additional compensation. The petitioners introduced evidence which shows that the salaries paid to each of them in each of the taxable years was comparable to and in some instances better than the amounts of salaries paid for the same and similar services by other advertising agencies doing a similar business. This proof was based upon comparative statements of operating costs during the same years made available by the American Association of Advertising Agencies, and on experience in the Chicago office in hiring employees. Cf. Glenshaw Glass Co., 13 T.C. 296, 307; R. P. Farnsworth & Co. v. Commissioner, 203 F. 2d 490, 492; J. H. Robinson Truck Lines v. Commissioner, 183 F. 2d 739. *155 Watson's salary for 1944 was $51,221, and in each of the 3 years 1945-1947 it was $54,300 per year. Littell's salary was $28,309 in 1944 and he received salary increases in each of the following 3 years. His salary increased to $36,074 in 1947. Emery's salary was $17,513 in 1944; it was increased in each year; it was $25,783 in 1947. We need not repeat the facts about the amounts of salaries paid to all of the other petitioners; the Findings of Fact show the amounts and the annual increases. At the end of 1943, the corporation adopted a pension and profit sharing plan and 1944 was the first year it was in effect. For 1943, the corporation's contributions to the fund amounted to $179,680, which was credited to the accounts of the employees in 1944. Watson, Emery, Littell and all of the petitioners except Zahner and one or two others had been employed by the corporation for more than 5 years and came under the plan. Under the plan, employees accrue annually benefits equal to 15 per cent of their compensation. The compensation of employees who had become eligible to participate in the plan was increased by its benefits. The evidence about salaries paid to other executive-employees who *156 did not purchase stock shows that the salary pattern in the taxable years was not related to stock ownership, and that there was no correlation between the salaries paid and the dividend. The corporation did not regard the dividend payments as compensation and no part of them was deducted or claimed as an expense for any of the years involved in the corporation's returns. Cf. Regulations 111, section 29.23(a)-6. An employer's failure to deduct payments as salary expense in its return although not conclusive is significant. The corporation did not withhold any social security taxes in respect of the dividend distributions. The employees who purchased stock, including the petitioners, considered the salaries received as full and adequate consideration for their services. No one who advocated the stock purchase plan and none of the employees who purchased stock requested or suggested increases in salaries or further compensation in any form. No one in any of the discussions with Ryan referred to the stock or the possible dividends as representing an arrangement for compensation for services. The respondent does not contend that the dividends paid in the taxable years were to provide more *157 complete requital for services rendered in the past. The purpose of the sales of stock and the subsequent payment of dividends was not to compensate the employees involved for past, contemporaneous, or future services. There was no anticipatory plan or understanding about the amount or rate of dividends to be paid in the future. With respect to those who purchased stock, salaries were not reduced, their duties were not increased, and the terms and conditions of employment were not changed in any way because of the sales of the stock. See Delbert B. Geeseman, 38 B.T.A. 258, 264; compare Wallace v. Commissioner, 219 F. 2d 855, 888, where it was held that distributions were compensatory. The purchase price of the stock was not made dependent upon the effectiveness of the service of any employee. No bonus arrangement was involved. Cf. Otto C. Schultz, 17 T.C. 695. The evidence shows that the regular salaries of each of the petitioners in the taxable years adequately and fully compensated them for their services. The respondent's reliance on the Overton case is misplaced. There the taxpayers, with 2 others, controlled a corporation; they caused the issuance of a second class of common *158 stock, B stock, and transferred it to their wives under an admitted plan to reduce their income taxes to a legal minimum. They used the B stock as a device for allocating to their wives dividends which otherwise would be paid to themselves on the A stock which they retained. They owned the property which produced the dividends in spite of transferring the B stock to their wives. The arrangements and circumstances in the instant cases are not similar. Neither the petitioners nor any group of the executive-employees of R & R outside the two families controlled the corporation. To them cannot be ascribed a plan to allocate stock to themselves in order to increase their compensation and divert it in the form of dividends to others. In Joseph Kane, supra, there was the intention that benefits from the exercise of an option given to Kane's wife to purchase stock of a prospective employer-corporation would constitute additional compensation for Kane's services. The option was given to induce Kane to accept employment by the corporation. The holding in the Kane case was reached upon its particular facts which are unlike the facts here. The respondent argues that because exceptionally good *159 dividends were paid in the taxable years, they were compensation in the guise of dividends and that such dividends evidence a tax avoidance plan. In this respect he argues that the purchase price was unreasonably low. It has been concluded that bona fide sales of stock were made, that the stock was valid stock, that in these transactions it was not intended that they were to serve as a device for making payments of additional compensation, and that the petitioners received adequate salaries in substantial amounts for their services. The evidence shows that the petitioners and other employees, in making requests to be allowed to buy stock, made demands for the ownership of interests in the corporation, not for increases in compensation. It shows also that the distributions were made because of the investments in stock and not purely for salaries. It follows that the distributions would be dividends and not compensation. Twin City Tile & Marble Co., 6 B.T.A. 1238, affd. 32 F. 2d 229. Compensation and dividends are different things. Regulations 111, section 23(a)-6, supra, defines compensation as "in fact payments purely for services", and indicates that if salaries of employee-stockholders *160 are excessive, and the excessive payments bear a close relationship to stockholdings of an employee, the excessive payments are a distribution of earnings upon the stock (pp. 89, 90). The petitioners introduced evidence which shows that their individual salaries in the taxable years were as good or better than other advertising concerns, doing a comparable business, paid for the same services. The inference to be drawn from this evidence is that the regular salaries fully compensated petitioners for their services. The petitioners took that view. The respondent did not undertake to refute petitioners' proof. He called no witnesses and offered no evidence relating to the adequacy of petitioners' salaries, or the inadequacy, and petitioners' evidence on this point stands unimpeached. Cf. R. P. Farnsworth & Co., supra; J. H. Robinson Truck Lines v. Commissioner, supra. The stock was fully paid for and was issued and outstanding. Dividends are an incident of stock ownership. The dividends were based on the overall net profits of the corporation. The dividends were regularly and duly declared. "The term 'dividend' in its technical, as well as ordinary acceptation, means that proportion *161 of profits which the corporation, by its directory, sets apart for ratable division among its stockholders." Mobile and O. R. Co. v. Tennessee, 153 U.S. 486; II Fletcher Cyclopedia Corporations, sec. 5318. The dividends here were paid pro rata to shareholders as dividends and were regarded by the recipients as dividends. What was said in Gardner-Denver Co. v. Commissioner, supra, p. 40, applies here: "The dividends are an incident of ownership of the stock, and however their payment may have advantaged the employees they did not represent outlay or expense of the [corporations] * * *." In other words. although good dividends were paid in the taxable years, it does not follow from that fact, in these cases, that they were compensatory. The respondent imputes to the corporation a lack of good faith in respect of the amount of the dividends paid each year on stock purchased under the employees' stock purchase plan, and he indicates that it is his view that the selling price of the stock was nominal. Such contentions require close scrutiny of the facts, which has been made. However, we are unable to find and conclude that tax avoidance motivated the dividend declarations or the sales *162 of stock. Dividends were paid pro rata on all of the outstanding common stock including the 22.2 per cent retained by the Ryans. It is our opinion that the stock was purchased in good faith at the agreed price. Further, we cannot say that there was a tax avoidance understanding about the amounts or rates of future, if any, dividends. See Rose v. Trust Co., 28 F. 2d 767, affirming 25 F. 2d 997. In addition, the amounts of the dividends on the common stock in the taxable years were not disproportionate in relation to net earnings after all other charges against net earnings, compared to prior years. The corporation consistently had paid dividends. On the other hand, we think it would be error for us to assume that when the stock was sold, the vendors knew what amount of net earnings after all charges would be available each year for dividends on the common stock. It could have been more or less than eventuated. Viewed in its entirety, the evidence obliges the conclusion that the motivating purpose of issuing the stock was to enable employees to acquire a proprietary interest in the business and that the dividends represented shares in the earnings thereof attributable to such interests *163 as distinguished from additional compensation. "There is no reason in law why such a transaction, * * *, must necessarily be compensation and cannot be what it purports to be." Patent Button Co. v. Commissioner, supra. It is held that the distributions in the taxable years were dividends and did not represent earnings taxable to the petitioners under Lucas v. Earl, supra, and Earp v. Jones, 131 F. 2d 292. Although in the cases of Watson, Littell, and Emery, the questions are decided in their favor, there must be recomputations under Rule 50. In the case of Littell, the respondent has abandoned an issue relating to a claimed dependency credit for his mother. In the other cases decisions will be entered for the respondent. Decisions will be entered under Rule 50 in Docket Nos. 55521, 56225, and 56237. Decisions will be entered for the respondent in Docket Nos. 56255, 56260, 56268, 56269, 56271, 56276, 56329, and 57397. Footnotes
1. The following cases have been consolidated herewith: Docket No. 56225, William Paul Littell; Docket No. 56237, Carlyle Emery; Docket No. 56255, Howard B. Ketting; Docket No. 56260, Kenneth D. Stewart; Docket No. 56268, Donald R. Willis; Docket No. 56269, Royden V. Rice; Docket No. 56271, Roswell W. Metzger; Docket No. 56276, H. S. Vanderbie; Docket No. 56329, Haakon B. Groseth; Docket No. 57397, Oscar Zahner.↩
2. Counsel for the individual petitioners are as follows: Keith I. Parsons, Esq., for Paul E. Watson; C. Ives Waldo, Jr., Esq., for William Paul Littell; William Cyril Burns, Esq., for Carlyle Emery; Harold L. Feigenholtz, Esq., for Howard B. Ketting, Donald R. Willis, Royden V. Rice, Roswell W. Metzger, H. S. Vanderbie, Haakon B. Groseth, and Oscar Zahner; and Theodore C. Weinberg, Esq., for Kenneth D. Stewart.
3. Respondent's objection to testimony of one of the witnesses for the petitioners about a modification of the repurchase agreement after 1947 (because beyond the taxable years) has been considered and is now overruled. The testimony to which the respondent objected was corroborated by another witness. By separate order, the objection has been overruled.↩
*. Bruce E. Ryan sold 300 shares to the R & R corporation on February 10, 1944.↩
*. Petitioners.↩
*. It is stipulated that the corporation acquired 2,400 shares at $5 per share, but the corporation's balance sheet shows that 2,500 shares were acquired. The discrepancy is not explained but it appears that 100 additional shares were acquired by the corporation from Bruce E. Ryan.)↩
*. Preferred Stock.↩
2. All of the certificates for the shares of stock were originally issued on December 2, 1943. See schedule, supra. ↩
3. Bruce E. Ryan sold his 300 shares of new common stock to the R & R Corporation on February 10, 1944.
1. Petitioners, or their wives and children. ↩
*. Anne Littell paid $5,500 of the dividends she received in 1947 to William P. Littell, as trustee of the trust she created.↩
1. Watson retained 300 shares; reported $3,000 as dividends for each year in his income; the respondent has added $13,000 to his taxable income for each year. ↩
2. Ketting did not transfer any stock to his wife until 1947; he reported in his income the payments received in 1945 and 1946; the respondent has included $4,000 in his 1947 taxable income. ↩
3. Stewart retained 50 shares, acquired in 1945, and reported in his income $250 for 1945; $500 for 1946; and $500 for 1947. The respondent has included in his taxable income $2,000 for each of the years 1944, 1945, and 1946, and $7,000 for 1947.
4. The respondent does not contend that any dividends are taxable to Paul E. Watson under the rule of the Corliss v. Bowers and Clifford line of cases.↩
5. The respondent conceded at the trial that the first issue is not present in the Watson case because he made valid gifts of stock to his children and his wife made a bona fide and complete purchase of stock so that the dividends qua dividends are taxable to the wife and children unless they were compensation for Watson's services. The second question, whether compensation was paid in the guise of dividends is presented in all of these cases but it need be considered only in the cases of Emery, Littell, and Watson.↩
6. Gardner-Denver Co. v. Commissioner (stock purchase), 75 F. 2d 38, affirming 27 B.T.A. 1171, certiorari denied 295 U.S. 763; Norman G. Nicolson (stock purchase), 13 T.C. 690; A. Levy & J. Zentner Co. (stock purchase), 31 B.T.A. 386; Rollins Burdick Hunter Co. (stock sales), 9 T.C. 169, reversed on another issue 174 F. 2d 698; John A. Decker (stock purchases), 32 T.C. 326; Fred B. Snite (stock sales), 10 T.C. 523, aff'd 177 F. 2d 819; Brockman Oil Well Cementing Co. (stock sales), 2 T.C. 168; Commissioner v. Straus (stock option plan), supra.